Argued and submitted November 4, 1981, reversed March 30, petition
for attorney fees denied August 3, 1982 (293 Or 440, 649 P2d 592)

## 1000 FRIENDS OF OREGON,
*Petitioner on Review,*

*v.*

## LAND CONSERVATION AND DEVELOPMENT COMMISSION,
*Respondent on Review.*

(CA 19269, SC 27956)

642 P2d 1158

Robert E. Stacey, Jr., Portland, argued the cause and filed the petition and brief.

Mary J. Deits, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were David B. Frohnmayer, Attorney General, John R. McCulloch, Jr., Solicitor General, William F. Gary, Deputy Solicitor General, and Al J. Laue, Assistant Attorney General, Salem.

TANZER, J.

## TANZER, J.

■ This is judicial review under ORS 183.400 of a Land Conservation and Development Commission (LCDC) rule[1] amending Statewide Planning Goal 14, the Urbanization Goal.

Goal 14 specifies requirements for local government comprehensive planning for conversion of rural land to urban land. It requires classification of land into two categories, rural and urban. It also establishes a third transitional category, urbanizable land, as that rural land which is most suitable to become urban as needed to accommodate urban population growth. Urban growth boundaries are planning devices which bound areas composed of urban and urbanizable land, separating them from rural land. The terms are defined in the goals:

Rural:

"Rural lands are those which are outside the urban growth boundary and are: (a) Non-urban agricultural,

---

[1] Although LCDC is authorized by ORS 197.040 to promulgate rules in accordance with the Administrative Procedures Act (APA), ORS 183.310 to 183.500, other procedures are specified for the preparation, adoption and amendment of goals. ORS 197.230 and 197.235 to 197.245. It is not clear, and we need not decide, whether the procedures are in lieu of or in addition to APA procedures. In any event, the goals are clearly rules within the meaning of ORS 183.310(7):

"'Rule' means any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency."

Petitioner has not challenged the amendment for noncompliance with ORS 197.230(1)(c), which provides:

"(1) In preparing, adopting and revising state-wide planning goals and guidelines, the department and the commission shall:

\* \* \* \* \*

(c) Make a finding of state-wide need for the adoption of any new goal or the revision of any existing goal."

In adopting this amendment, LCDC found that it was needed

"\* \* \* to effectuate past Commission policy on the application of the goals inside city limits."

This may be a statement of convenience or reason, perhaps occasioned by the decision of the Court of Appeals in *Willamette University v. LCDC,* 45 Or App 355, 608 P2d 1178 (1980), that an order approving an urban growth boundary was unlawful. It is at least questionable, however, whether it suffices as a "finding of statewide need" for the amendment. *See* ORS 183.400(4)(c). In any event, because it was not raised, we do not reach the issue.

forest or open space lands or, (b) Other lands suitable for sparse settlement, small farms or acreage homesites with no or hardly any public services, and which are not suitable, necessary or intended for urban use."

## Urbanizable:

"Urbanizable lands are those lands within the urban growth boundary and which are identified and (a) Determined to be necessary and suitable for future urban areas (b) Can be served by urban services and facilities (c) Are needed for the expansion of an urban area."

## Urban:

"Urban areas are those places which must have an incorporated city. Such areas may include lands adjacent to and outside the incorporated city and may also; (a) Have concentrations of persons who generally reside and work in the area (b) Have supporting public facilities and services." Oregon Administrative Rules 660-15-000, Definitions.

It is the transitional category, urbanizable land, which is most troublesome because it is the focal point of conflict between forces promoting conservation of rural resources and those who desire urban development. Goal 14 is written to assure that the decisions involved in the designation of urbanizable land are guided by consideration of all material aspects of public policy. To that end, Goal 14 specifies a broad range of seven physical, economic and environmental "factors" relating to the need and suitability of land for urbanization which cities and counties must consider when they establish or change urban growth boundaries. The first two factors relate to urban growth needs; the other five relate to broader concerns.

The challenged goal amendment is in two parts: It provides that prior to establishment of an urban growth boundary, all land within city limits shall be classified as urban or urbanizable automatically and without need to consider the urban need, physical, economic and environmental factors which otherwise would have to be consider ed. Second, it allows city limits to be designated as an urban growth boundary if the enclosed land is adequate under the two factors relating to urban need and without

regard to the other five factors.[2] If the city area is insufficient to serve urban growth needs, then an area larger than the city may be included within the urban growth boundary by application of Goal 14 generally.

Goal 14, in its entirety, with the challenged amendment italicized, provides:

"GOAL: To provide for an orderly and efficient transition from rural to urban land use.

"Urban growth boundaries shall be established to identify and separate urbanizable land from rural land.

"Establishment and change of the boundaries shall be based upon consideration of the following factors:

(1) Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

(2) Need for housing, employment opportunities, and livability;

(3) Orderly and economic provision for public facilities and services;

(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

(5) Environmental, energy, economic and social consequences;

(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

(7) Compatibility of the proposed urban uses with nearby agricultural activities.

*"Before the establishment of an urban growth boundary, all lands within city limits shall be urban or urbanizable. When the amount of land within a city's incorporated limits is determined to be adequate to satisfy the needs set forth in factors (1) and (2) above, the city limits may be designated as the urban growth boundary without consideration of factors (3) through (7) above.*

"The results of the above considerations shall be included in the comprehensive plan. In the case of a change

---

[2] LCDC, in its brief, summarizes the effect of the amendment as:

"* * * The amendment revises Goal 14 so as to allow a city and county to establish an existing city limits as an Urban Growth Boundary (UGB) without consideration of certain UGB establishment factors which remain applicable to jurisdictions with UGB's larger than the city limits."

Except for the word "certain," that is also an accurate summary.

of a boundary, a governing body proposing such change in the boundary separating urbanizable land from rural land, shall follow the procedures and requirements as set forth in the Land Use Planning Goal (Goal 2) for goal exceptions."

"Any urban growth boundary established prior to January 1, 1975 which includes rural lands that have not been built upon shall be reviewed by the governing body, utilizing the same factors applicable to the establishment or change of urban growth boundaries.

"* * * * *

"Land within the boundaries separating urbanizable land from rural land shall be considered available over time for urban uses. Conversion of urbanizable land to urban uses shall be based on consideration of:

(1) Orderly, economic provision for public facilities and services;

(2) Availability of sufficient land for the various uses to insure choices in the market place;

(3) LCDC goals; and

(4) Encouragement of development within urban areas before conversion of urbanizable areas."[3]

Absent the amendment, city limits would have no presumptive effect. The designation of an urban growth boundary would be guided by the seven "factors" of Goal 14, and any other of the 19 statewide planning goals which are applicable because of the use or nature of the land to be included within the boundary. The city limits, while perhaps relevant, would not be determinative. As a clear example, if a city had an estuary within the city limits, it might not be free to include the entire estuary within its urban growth boundary because Goal 16, the Estuarine

---

[3] The goal also states planning and implementation guidelines dealing with population needs, air, land and water capacity, financial and regulatory devices, management, etc.

The reference in factor (1) to "LCDC goals" is ambiguous. We read the reference to qualify only the determination of urban population growth requirements. We do not read it as a back door requirement for application of all LCDC goals in determining the validity of a city boundary as an urban growth boundary. If that were so, inclusion of the remaining five factors would be redundant. Factor (6), for example, parallels Goal 3. There would be no reason to provide Factor (6) if Goal 3 had already been incorporated by reference to the goal in Factor (1). Similarly, the other factors are the subjects of goals. The drafters could not have intended that governing bodies apply the goals specifically in considering factor (1) and then apply them again generally in applying the remaining factors.

Resources Goal, severely limits permissible uses within certain areas of the estuary. Or, if a city had agricultural land within its city limits, it could only include that land within the urban growth boundary by applying the "conversion factors" of Goal 3,[4] the Agricultural Lands Goal, and by following the exception procedures of Goal 2,[5] the Land Use Planning Goal. Other goals might also be applicable. We intend by these examples only to illustrate Goal 14's operation before it was amended.

As a result of the goal amendment, land within the municipal boundaries of a city is automatically deemed

---

[4] Goal 3 provides:

"GOAL: To preserve and maintain agricultural lands.

"Agriculture lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open spaces. These lands shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS Chapter 215. Such minimum lot sizes as are utilized for any farm use zones shall be appropriate for the continuation of the existing commercial agricultural enterprise with the area. Conversion of rural agricultural land to urbanizable land shall be based upon consideration of the following factors: (1) environmental, energy, social and economic consequences; (2) demonstrated need consistent with LCDC goals; (3) unavailability of an alternative suitable location for the requested use; (4) compatibility of the proposed use with related agricultural land; and (5) the retention of Class I, II, III and IV soils in farm use. A governing body proposing to convert rural agricultural land to urbanizable land shall follow the procedures and requirements set forth in the Land Use Planning goal (Goal 2) for goal exceptions."

[5] Goal 2 provides:

"PART II - EXCEPTIONS: When, during the application of the statewide goals to plans, it appears that it is not possible to apply the appropriate goal to specific properties or situations, then each proposed exception to a goal shall be set forth during the plan preparation phases and also specifically noted in the notices of public hearing. The notices of hearing shall summarize the issues in an understandable and meaningful manner.

"If the exception to the goal is adopted, then the compelling reasons and facts for that conclusion shall be completely set forth in the plan and shall include:

(a)  Why these other uses should be provided for;

(b)  What alternative locations within the area could be used for the proposed uses;

(c)  What are the long term environmental, economic, social and energy consequences to the locality, the region or the state from not applying the goal or permitting the alternative use;

(d)  A finding that the proposed uses will be compatible with other adjacent uses."

urban or urbanizable regardless of the actual nature or use of the land. The factors and other goals no longer affect many situations in which they formerly were to be applied. Now, a municipal boundary alone is determinative that the enclosed land is urban or urbanizable without regard to the seven factors of Goal 14 and without regard to the policies of the other goals. That land must be automatically deemed urban and urbanizable wherever the urban growth boundary is ultimately established. If land within the city is not sufficient to satisfy the needs of urban growth population under factors (1) and (2), then a comprehensive plan may designate a larger area to be enclosed by the urban growth boundary, applying factors (3) to (7) as well. If the land within the city is adequate to serve urban growth needs, then the city limits may be designated the urban growth boundary even if the boundary contains far more land than is adequate for need, including unneeded land which would be treated differently if the Goal 14 factors and other goals were applicable. For example, if a substantial area of Class I agricultural land is within city limits, it is automatically deemed urban or urbanizable for inclusion within the urban growth boundary, even though consideration of Goal 14 factor (6) and Goal 3, the Agricultural Goal, would probably require conservation of the land as agricultural. More starkly, if all or part of an estuary is within the city, it would be deemed urban or urbanizable regardless of the prohibition of Goal 16 (although state ownership would probably preclude an inappropriate use, *see* ORS 274.710). In essence, the amendment adopts a baseline for planning which authorizes cities to plan on the development of all city land regardless of its nature and present use.[6]

---

[6] We find this to be the most probable meaning and effect of the amendment. We recognize, however, that it is capable of a partially different construction. The first sentence could be read to apply only to land use decisions made prior to establishment of urban growth boundaries, but not to control the process of establishing the boundary itself. The second sentence could be read to allow all needed land within city limits to be included when establishing urban growth boundaries, but not to require it, leaving the cities free to apply the other factors or not in their discretion. Cf. *Willamette University v. LCDC, supra* n 1.

If that construction is given the amendment, then the goals applicable to land use decisions made prior to urban growth boundary establishment would differ from those to be applied after. An incremental process allowing pre-acknowledgment land use decisions which would be impermissible if made later or as a part of the comprehensive plan would appear to be inconsistent with the legislative policies discussed in this opinion.

■ The parties agree that the validity of the amendment may be determined as if it were a part of Goal 14 initially, and that is correct. Petitioner challenges the amendment on the ground that it "exceeds its [LCDC's] statutory authority." LCDC counters that it is within its statutory authority. Although they agree that this is the basic issue, however, their analyses are different.

Petitioner argues that the effect of the amendment is to exempt land within cities from application of the goals because LCDC's review responsibilities under ORS 197.251(5) are unlawfully precluded. If, for example, a city annexes agricultural land, nobody seeks LCDC review of that annexation as a land use decision, and the land is committed to non-agricultural use, the change becomes an accomplished fact. Later, when LCDC reviews the comprehensive plan for acknowledgment, the goal amendment would authorize inclusion of the annexed land within the urban growth boundary regardless of the application of the other goals and Goal 14 factors.

LCDC responds in several steps. First, it argues that petitioner's argument is wrong because, regardless of the amendment, any land use decision can be reviewed for goal compliance upon petition to LCDC. More significantly, it argues that the issue of whether the amendment exceeds LCDC's statutory authority is substantive rather than procedural. There may be procedural effects of the amendment, LCDC argues, but there is no exemption of land from the application of the goals or retreat from responsibility to review for goal compliance. Rather, the applicable goal has been changed. At oral argument, counsel for LCDC synthesized its contention this way:

> "Here, the question is not whether the goals as a whole are applicable, but the question is whether LCDC has the authority in its goals, by amending its goals, to change the definition and thereby to limit the applicability of the goals and that, we contend, is what occurred here."

It is not true that LCDC has declined to apply the goals, she argued. Rather, the goals are still applicable but they have been changed.

■ We agree with the substantive framing of the issue by LCDC. A rule (or goal) is within or without the legislative delegation of authority, when adopted. Its lawfulness

does not depend upon the existence or the adequacy of procedures for review of specific applications of the rule after its adoption. The rule stands or falls on its content, even though it may have procedural consequences. We consider petitioner's arguments regarding exemption from goal application as they affect the substantive issue. We therefore examine whether LCDC, by goal, can lawfully require local government to make land available for urban development on the sole basis that the land is within a city boundary.

■     Goal 14 was adopted and amended by LCDC pursuant to its general authority to do so under ORS 197.225. The legislature might have enacted permanent goals, but it chose not to. Rather, it enacted broad policies and delegated to a new agency, LCDC, legislative authority to refine and particularize those policies by adoption of land use goals and rules. In *Springfield Education Assn. v. School Dist.*, 290 Or 217, 229, 621 P2d 547 (1980), we described the role of the court and the agency in the process of judicial review of an agency exercise of delegated legislative authority:

> "* * * The delegation of responsibility for policy refinement under such a statute is to the agency, not to the court. The discretionary function of the agency is to make the choice and the review function of the court is to see that the agency's decision is within the range of discretion allowed by the more general policy of the statute. * * *"

Here, we review to determine if the rule "exceeds the statutory authority of the agency," *see* ORS 183.400(4)(b).

■     The issue on review is whether it is within LCDC's delegated legislative authority to adopt a statewide land use planning goal which requires local governments to make all land within city limits available for urban development without regard to the use and nature of the land and without regard to the policies of the goals generally. We address the issue by inquiring into the policies which underlie the legislation.

Land use planning and regulation in Oregon occurs within a framework enacted in 1973 as Senate Bill 100 which, with some amendments, now appears as ORS ch

197.[7] The impetus was legislative concern that state intervention was needed to stop a process of cumulative public harm resulting from uncoordinated land use. To stop that threat and to provide for a more satisfactory future, the legislature established our now familiar system of local and state comprehensive land use planning performed in compliance with statewide land use goals adopted by LCDC. The legislative concern and remedy are reflected in the legislative findings and policy statement which preceded SB 100 and, with slight modification, are now codified as ORS 197.005 and 197.010:

ORS 197.005:

"The Legislative Assembly finds that:

(1) Uncoordinated use of lands within this state threaten the orderly development, the environment of this state and the health, safety, order, convenience, prosperity and welfare of the people of this state.

(2) To promote coordinated administration of land uses consistent with comprehensive plans adopted throughout the state, it is necessary to establish a process for the review of state agency, city, county and special district land conservation and development plans for compliance with state-wide planning goals.

(3) Except as otherwise provided in subsection (4) of this section, cities and counties should remain as the agencies to consider, promote and manage the local aspects of land conservation and development for the best interests of the people within their jurisdictions.

(4) The promotion of coordinated state-wide land conservation and development requires the creation of a state-wide planning agency to prescribe planning goals and objectives to be applied by state agencies, cities, counties and special districts throughout the state."

ORS 197.010:

"The Legislative Assembly declares that, in order to assure the highest possible level of liveability in Oregon, it is necessary to provide for properly prepared and coordinated comprehensive plans for cities and counties, regional areas and the state as a whole. These comprehensive plans:

---

[7] Chapter 197 has been amended extensively by the 1981 legislature, Or Laws 1981, ch 748, but not in ways which affect this case. References throughout are to the 1981 codification of ORS chapter 197, unless otherwise noted.

(1) Must be adopted by the appropriate governing body at the local and state levels;

(2) Are expressions of public policy in the form of policy statements, generalized maps and standards and guidelines;

(3) Shall be the basis for more specific rules and land use regulations which implement the policies expressed through the comprehensive plans;

(4) Shall be prepared to assure that all public actions are consistent and coordinated with the policies expressed through the comprehensive plans; and

(5) Shall be regularly reviewed and, if necessary, amended to keep them consistent with the changing needs and desires of the public they are designed to serve."

The first legislative finding in particular indicates an intention to put a prompt halt to the threatening consequences of uncoordinated land use, and it is significant that the legislature used the word "threaten" in its present, not future, tense. The threat was stated as a present one, not an anticipated or potential threat. A type of uncoordinated land use pertinent to this case, was the historical process by which municipal boundaries had been designated. Prior to 1973, land might have been initially incorporated within a city or annexed to it for varying political reasons of policy or expediency. For example, City A might have taken a highly conservative approach to annexation to avoid burdening municipal services such as police protection or water or to preserve a homogeneous population or simply as a matter of political intuition. Nearby City B, however, might have expanded aggressively into the countryside to enlarge its tax base, to extend fire protection to a nearby cannery, to serve personal interests or for any number of other reasons.

Senate Bill 100 was intended to change the prevailing inconsistent practice of land use decision-making and to substitute a systematic decisional process based on comprehensive consideration of all relevant facts, affected interests and public policies. The reasons for which city boundaries were drawn historically are not necessarily consistent with the policies which, under the legislation, must now be applied for the conservation and development of land. Indeed, land might have been included or excluded

from city boundaries for reasons which are entirely contradictory to the procedural and substantive public policies which SB 100 was intended to effectuate. It is inconsistent with the legislative intention to require coordinated land use for LCDC to require that substantial areas of agricultural or other protected land be made available for urban development for the sole reason that the land happens to be within city limits and without regard to social, economic and environmental policies.

The alacrity with which the legislature acted is significant. The adoption of goals by LCDC was expected to take time, but land use decisions could not come to a halt. The legislature did not postpone action. It adopted interim statutory goals to guide comprehensive planning and land use decisions until LCDC goals were adopted. By its example in the adoption of interim statutory goals, the legislature indicated the breadth of substantive legislative concerns to be addressed in the administratively adopted goals:

"(1)  * * *  Goals for comprehensive physical planning are:

(a)  To preserve the quality of the air, water and land resources of the state.

(b)  To conserve open space and protect natural and scenic resources.

(c)  To provide for the recreational needs of citizens of the state and visitors.

(d)  To conserve prime farm lands for the production of crops.

(e)  To provide for an orderly and efficient transition from rural to urban land use.

(f)  To protect life and property in areas subject to floods, landslides and other natural disasters.

(g)  To provide and encourage a safe, convenient and economic transportation system including all modes of transportation: Air, water, rail, highway and mass transit, and recognizing differences in the social costs in the various modes of transportation.

(h)  To develop a timely, orderly and efficient arrangement of public facilities and services to serve as a framework for urban and rural development.

(i)  To diversify and improve the economy of the state.

(j) To ensure that the development of properties within the state is commensurate with the character and the physical limitations of the land." ORS 215.515, repealed Or Laws 1977, ch 664, § 42.

The interim statutory goals reflect a legislative intention that land use decisions, even during the transitional period, be based upon consideration of a full range of environmental, conservation, recreational, agricultural, economic and other substantive legislative concerns. The authority for LCDC to formulate and adopt goals was general, but every indication from the legislative history is that LCDC's concerns were to be at least as comprehensive as those expressed in the interim statutory goals. It is unlikely that the legislature which promulgated such broadly ranging interim goals intended that substantial areas of agricultural lands be made available for urban development for the sole reason that they are within city boundaries.

Most of the legislative directives to LCDC were procedural. The legislature did not define "goals," "preferring the definition to be refined in the process of citizen input, commission approval and legislative review." Senate Journal, April 18, 1973, Morning Session (SB 100). Nor did it dictate to LCDC the content of the goals which were to be adopted, but it gave some substantive guidance. Of particular pertinence here, it directed LCDC, in the formulation of goals, to "consider" the existing plans of cities and counties, and to "give priority consideration" to natural resources such as agricultural land. What is now ORS 197.230(1) provides:

"In preparing and adopting state-wide planning goals and guidelines, the department and the commission shall:

(1) *Consider* the existing comprehensive plans of state agencies, cities, counties and special districts in order to preserve functional and local aspects of land conservation and development.

(2) *Give priority consideration* to the following areas and activities:

(a) Lands adjacent to freeway interchanges;

(b) Estuarine areas;

(c) Tide, marsh and wetland areas;

(d) Lakes and lakeshore areas;

    (e)   Wilderness, recreational and outstanding scenic areas;

    (f)   Beaches, dunes, coastal headlands and related areas;

    (g)   Wild and scenic rivers and related lands;

    (h)   Flood plains and areas of geologic hazard;

    (i)   Unique wildlife habitats; and

    (j)   Agricultural land." (Emphasis added.)

These statutory requirements for goals demonstrate the high degree of legislative concern that the goals protect agricultural land and the natural treasures of our state. These directions also suggest that the legislature intended that agricultural land not be made available for urban development solely because it is within a city boundary.

    The statutory definition of "comprehensive plan" also reinforces our perception of the breadth of public policies which the legislature intended be considered in the course of land use planning. A comprehensive plan must take into account such urban needs as sewer and water systems, but also "all functional and natural systems and activities relating to the use of lands" such as "natural resources and air and water quality management programs." ORS 197.015(5) provides:

> " 'Comprehensive plan' means a generalized, coordinated land use map and policy statement of the governing body of a state agency, city, county or special district that interrelates all functional and natural systems and activities relating to the use of lands, including but not limited to sewer and water systems, recreational facilities, and natural resources and air and water quality management programs. 'Comprehensive' means all-inclusive, both in terms of the geographic area covered and functional and natural activities and systems occurring in the area covered by the plan. 'General nature' means a summary of policies and proposals in broad categories and does not necessarily indicate specific locations of any area, activity or use. A plan is 'coordinated' when the needs of all levels of governments, semipublic and private agencies and the citizens of Oregon have been considered and accommodated as much as possible. 'Land' includes water, both surface and subsurface, and the air."

In other words, ORS 197.015(5) requires that a comprehensive plan be truly comprehensive. This statute is also

indicative that LCDC cannot lawfully require local governments to designate agricultural land for urban development without a comprehensive consideration of pertinent public policies.

■ This review of the statutory setting of LCDC's authority to adopt and amend rules leads to the conclusion that LCDC's goal amendment is not authorized by the legislative delegation. The consistent requirement by the legislature in it findings and policy statement, in its interim goals, in the statutory directions for priority consideration by LCDC in its adoption of goals, and in the breadth of definition of "comprehensive plan," is that the full range of affected public interests be considered in the process of comprehensive planning for land use decisions. That requirement is offended by a goal which would make substantial areas of land available for urban development for the sole reason that they are within city boundaries.[8]

■ Also, the finding of uncoordinated land use as a presently threatening process to be dealt with, the alacrity with which the legislature acted in establishing interim goals to avoid damage to the state's resources during the planning process, and the direction in ORS 197.230(1) that LCDC *consider* existing plans but *give priority consideration* to various natural resources, all lead us to the conclusion that the legislature did not intend that LCDC goals be drawn to require or tolerate inappropriate future use of land for the sole reason that the land had been included within a city prior to the adoption of the goal. As we discern the intention of the legislation, comprehensive plans must designate future uses of land based upon consideration of all relevant public policies.

LCDC asserts that the purpose of the amendment is a practical one, recognizing the planning difficulties of local government. Local governments are not equipped to "go through all the motions" required for planning for use of agricultural land and should not be required to do so "when it doesn't make any sense." ORS ch 197 does not

---

[8] If the goal amendment is read to require urbanizable status only for land use decisions made prior to establishment of urban growth boundaries as suggested above at n 6, then, even in that limited way, it would still be contrary to legislative policy.

require LCDC to require cities without substantial areas of agricultural or other protected land to engage in useless planning. Nor does it authorize LCDC to require cities which have chosen to include such lands within their limits to ignore public policies favoring their conservation. We are confident that LCDC can find a more specific means to serve practical needs.

For these reasons, we conclude that the amendment to Goal 14 is invalid.

Reversed.