Argued and submitted July 27, 1999, affirmed February 23, petition for review denied June 20, 2000 (330 Or 363)

**PORT OF ST. HELENS,**
Transwestern Aviation, Inc.,
and City of Scappoose,
a municipal corporation,
*Petitioners,*

*v.*

**LAND CONSERVATION AND
DEVELOPMENT COMMISSION,**
*Respondent,*

*and*

**NORTHWEST AGGREGATES CO.,**
aka Lone Star Northwest, Inc.,
*Intervenor.*

(98-WKTASK-00951; CA A103561)

996 P2d 1014

Mark J. Greenfield argued the cause and filed the brief for petitioner Port of St. Helens. With him on the brief were Christopher P. Thomas and Moskowitz & Thomas for petitioner Transwestern Aviation, Inc.

Jeff Bennett and Tarlow, Jordan & Schrader filed the briefs for petitioner City of Scappoose.

Celeste Doyle, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and John T. Bagg, Assistant Attorney General.

Michael R. Campbell, Steven W. Abel, and Stoel Rives LLP filed the brief for intervenor Northwest Aggregates Co., aka Lone Star Northwest, Inc.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

DEITS, C. J.

## DEITS, C. J.

Petitioners[1] seek review of the Land Conservation and Development Commission's (LCDC) periodic review order that directed Columbia County to delete certain provisions from its comprehensive plan and its zoning ordinance. We affirm.

Beginning in 1992, the City of Scappoose amended its comprehensive plan and urban growth boundary (UGB), annexed certain territory and took related actions to plan for the eventual commercial and industrial development of the Scappoose Industrial Airpark (airpark), in the vicinity of the local airport. The city's amended comprehensive plan, with its commercial and industrial designation of the airpark area, is acknowledged. Subsequently, in conjunction with the present periodic review proceedings, the county adopted plan and ordinance provisions aimed at preventing aggregate and mineral surface mining on county lands in proximity to the city areas that the city has designated for the eventual industrial and commercial uses. The county provisions state, *inter alia*, that "mining shall not be allowed" at sites

"within 3,000 feet of an area designated by an acknowledged comprehensive plan for future diverse, employment intensive, non-polluting industrial uses as of April 1, 1998."

The county areas that are affected by those provisions are mainly, if not entirely, agricultural lands that are zoned for exclusive farm use (EFU).

In 1996, after the city took its planning actions regarding the airpark, but before the county adopted the provisions proscribing mining on the areas subject to its planning authority that are near the airpark, LCDC amended Goal 5 and its Goal 5 implementing rule with respect to mining at "significant mineral and aggregate sites." OAR 660-023-0180(4)(b), the section of the new rule that both exemplifies and is the focus of the parties' dispute, provides, as relevant:

---

[1] The City of Scappoose has appeared separately from the other petitioners. However, all of the petitioners join in one another's arguments and assignments, and it is unnecessary for us to treat them separately in this opinion.

"The local government shall determine existing or approved land uses within the impact area that will be adversely affected by proposed mining operations and shall specify the predicted conflicts. For purposes of this section, 'approved land uses' are dwellings allowed by a residential zone on existing platted lots and other uses for which conditional or final approvals have been granted by the local government."

As summarized in LCDC's brief, the "effect of [its] rule is to limit a local government's identification of uses with which mining would conflict"—and hence to and for which its permissibility could be limited or subordinated by local governments—"to those that are approved or in existence." Thus, aggregate and mineral mining is treated differently from the way it was treated under the previous LCDC rule—and from the way most if not all other Goal 5 resources and uses continue to be treated—in that local governments may evaluate the others in light of conflicts with planned uses, as well as with approved or existing uses, while OAR 660-023-0180(4)(b) confines the inquiry in the case of mining to conflicting uses that are in existence or have received final approval.

Although the city had planned the airpark area for eventual commercial and industrial development, no specific uses of that kind were in existence or had received final approval as of the date that the county provisions were enacted. Moreover, the county provisions by their terms apply to "designated" and "future" uses. Consequently, LCDC concluded that the county provisions were contrary to the new Goal 5 rule insofar as they categorically prohibit mining on county land within the specified distance from areas designated for future industrial uses in the city's acknowledged comprehensive plan. Petitioners seek review of LCDC's resulting order that the county delete the provisions in question from its land use legislation.

Petitioners present seven assignments of error and a greater number of specific supporting arguments. At their core, however, petitioners' arguments depend on three essential premises: First, that by treating aggregate and mineral mining in the way they do and more favorably than other

uses, the amended Goal 5 and OAR 660-023-0180(4) are contrary to "the policies that underlie" the state's land use statutes; second, that the new rule is contrary to ORS 197.712 and Goal 9, relating to economic development as a land use objective and, derivatively, is also contrary to the requirement of ORS 197.340 that all of the planning goals are to receive equal weight in their application; and third, that insofar as the new rule and LCDC's order have frustrated the county's effort to act compatibly with the city's plan, they are contrary to the coordination and consistency requirements of Goal 2 and to the consistent implementation of LCDC's acknowledgment responsibilities under ORS 197.251.

■ Petitioners present their contentions in more or less the order stated, moving from the general proposition that LCDC's rule is at odds with the state's land use laws to the specific proposition that the rule has resulted in a planning anomaly and inconsistency here. However, we find it more convenient to consider their contentions in the opposite order. In our view, there is no inconsistency between the city plan as acknowledged by LCDC and the county plan and legislation without the provisions that LCDC's present order requires the county to delete. In *City of Portland v. Washington County*, 27 Or LUBA 176, *aff'd* 131 Or App 630, 886 P2d 1084 (1994), LUBA addressed the coordination and consistency requirements of Goal 2 at length. It concluded that the requirements were violated in that case and two companion cases, in which Washington County and the cities of Portland and Beaverton had each unilaterally amended provisions of their comprehensive plans that related to the same subject and territory and that, as amended, were incompatible with one another. In its discussion of the coordination and consistency issue, LUBA contrasted cases like the one before it from those of which it said:

> "In many situations where affected local governments disagree about whether a proposed action adequately addresses their needs, 'consistency' is not an issue. This is because city and county comprehensive plans generally do not directly assert planning interests outside the planning entity's municipal jurisdiction. Therefore, while changes in the comprehensive plans of nearby jurisdictions may have

indirect consequences for or impacts on a city or county plan, those changes will not amount to a conflict or result in an inconsistency." *City of Portland*, 27 Or LUBA at 188.

As LUBA recognized in *City of Portland,* and as we recognize in principle here, there are many gradations between the facts in *City of Portland* and the polar opposite of those facts described in the foregoing quotation from LUBA's opinion. However, this case is more akin to the situations described in the quotation. None of the land in the airpark area, or the land that the city has included in its UGB, is outside the city or subject to the county's direct planning authority. None of the land that the pertinent county provisions address is within the city or the city's direct planning authority. The city lands are designated for industrial development. The county lands are agricultural lands, as a matter of *state* law, and remain zoned for exclusive farm use by the county. Under state law, commercial and industrial uses are generally impermissible on EFU land, while aggregate and mineral surface mining *are* conditionally permissible on land zoned EFU. *See* Goal 3; ORS 215.213(2) and ORS 215.283(2).

In sum, petitioners' argument that LCDC's order creates an inconsistency between the city and county plans is premised on the understanding that, to comply with Goal 2, the county must prohibit a statutorily permitted use on agricultural land that is located wholly within its territory and planning authority in order to support as yet nonexistent industrial uses on urban or urbanizable land that is located in its entirety outside the county's planning jurisdiction.[2] We do not agree with petitioners' understanding, and we do not agree that the deletion of the county plan and ordinance provisions ordered by LCDC would create any inconsistency between the land use legislation of the two jurisdictions. LCDC's order simply requires the county to keep open the *possibility* of allowing a rural use on its own rural land that

---

[2] Petitioners' reliance on the county's regional coordination authority under ORS 195.025 is misplaced. The question in this case is whether LCDC's order, which implicitly concludes that the county's plan for its own territory does not comply with Goal 5, is erroneous. Whether the county is in compliance—as well as whether the two plans are coordinated and consistent—are initially questions for LCDC for purposes of this proceeding. *See City of Portland*, 27 Or LUBA at 185-86.

happens to be near land that the city plans for eventual urban use.[3]

We turn next to petitioners' arguments that the LCDC rule and/or the order in this case violate Goal 9 and ORS 197.712, which relate to economic development as a land use objective. Petitioners make a number of specific contentions, along with their underlying refrain that the city's proposed use of the adjacent area promotes economic development and that LCDC's rejection of the county's proffered efforts to support that use is, therefore, antithetical to the economy.

■■ The specific contention that petitioners urge most strenuously turns on ORS 197.712(2)(d). That section provides:

"(2) By the adoption of new goals or rules, or the application, interpretation or amendment of existing goals or rules, [LCDC] shall implement all of [numerous specified requirements, including]:

"* * * * *

"(d) Comprehensive plans and land use regulations shall provide for compatible uses on or near sites zoned for specific industrial or commercial uses."

Petitioners maintain that the statute applies "both inside and outside UGBs," and that it requires the county to provide for uses that are compatible with the industrial uses for which the nearby city airpark area is zoned. The short answer to petitioners' argument is that they are mistaken in

---

[3] Petitioners are incorrect insofar as they suggest that LCDC's order requires the county to allow mining uses in the relevant area. Rather, the order rejects the county's attempt to prohibit mining uses categorically. Whether a particular use will or will not be allowed depends, *inter alia*, on numerous criteria in LCDC's rule (or, eventually, the county's legislation after it is in compliance) that are not directly at issue here.

Relatedly, petitioners posit that mining uses in the county territories would discourage development from occurring in the airpark area or interfere with the operation of industrial uses if they are eventually located in the area. That, too, is an issue that may bear on whether particular mining operations that may be applied for will be allowed by the county. Insofar as petitioners' point is that the *possibility* of mining operations in the county areas may deter prospective industrial businesses from settling in the city, that is a matter of conjecture and of policy judgment that is for LCDC, rather than the courts, to make.

their first premise. The requirements of ORS 197.712(2)(a) to (f) are addressed to LCDC, and the statute directs it to implement its requirements through new or existing goals and rules. LCDC has done so through Goal 9. The goal's numbered provision 4 is identical, in substance, to ORS 197.712(2)(d), but the goal expressly makes the requirement applicable only to "[c]omprehensive plans for urban areas[.]" The Goal 9 provision is well within LCDC's broad delegative authority to refine the statutory policy, *see Lane County v. LCDC*, 325 Or 569, 942 P2d 278 (1997), and it clearly limits the requirement petitioners cite to lands that are not of the rural and resource character of the county lands involved here. Consequently, neither LCDC's Goal 5 rule nor its order is inconsistent with either Goal 9 or ORS 197.712, insofar as they disallow the county's outright prohibition of mining uses on the rural county land in question.[4]

The other specific argument that calls for discussion in this connection is petitioners' assertion that the amended Goal 5, and the new LCDC implementing rules, are "directly contrary to the policy and requirements of ORS 197.712" and of Goal 9 and, concomitantly, that their application in LCDC's order here violates the requirement of ORS 197.340(1) that the statewide planning goals be given equal weight in planning matters to which they are pertinent.

Although petitioners appear to believe that it is the *amended* Goal 5 and the *new* implementing rule that are the culprits in the foregoing scenario, a careful analysis of their arguments and their reasoning shows no basis for concluding that the new versions of the goal and rule are significantly different from their predecessors for purposes of petitioners' essential concern. That concern is that Goal 5 and OAR 660-023-0180(4) tend to allow the mining of aggregate and mineral resources to a greater extent than petitioners regard as good for economic growth and, therefore, as compatible with Goal 9.

---

[4] We need not address any alternative bases for resolving petitioners' argument.

There is, of course, no doubt that different statewide planning goals promote different land use values and, necessarily, there is some operational tension among them. Given that truism, it is perhaps surprising how infrequently we have been presented with arguments that the goals or implementing rules are in facial conflict with one another, or that one goal rather than another has received undue (or insufficient) weight from the maker of a particular challenged decision. In at least two previous cases where arguments of that kind *were* advanced, the specific assertions of the proponents, like petitioners' here, were that the economic objectives of Goal 9 and the economic development statute prevailed over the preservationist objectives of other goals. In rejecting such an argument in *Benjfran Development v. Metro Service Dist.*, 95 Or App 22, 26, 767 P2d 467 (1989), we said:

"Whatever the full relationship may be between the statutory and regulatory economic development provisions and the Goal 14 need factors, the former do not completely preempt the latter, as petitioner seems to postulate. Under petitioner's theory, local governments would be required to find a need to urbanize land to accommodate *every* developmental proposal, regardless of the adequacy of currently urbanized or urbanizable land to serve the economic development requirements of the locality. Petitioner suggests no reason why *its* proposal answers a need or why the current economic circumstances within Metro's UGB leave a need to be answered. Stated differently, petitioner's argument can succeed only if Goal 9, ORS 197.707 *et seq* or the implementing provisions which localities must adopt pursuant to the statutes mandate the approval of every land use proposal with potential beneficial economic effects. We hold that the argument does not succeed." (Emphasis in original.)

*See also DLCD v. Yamhill County*, 99 Or App 441, 447-48, 783 P2d 16 (1989).

Petitioner's argument in this case, like the argument in *Benjfran Development*, offers no persuasive reason why the economic objectives of Goal 9 and ORS 197.712 are either facially affronted by or, as applied here, are entitled to prevail over the resource values with which Goal 5 and OAR 660-023-0180 are concerned. Petitioners simply postulate that, because they prefer one use of the land over another,

the goal that regulates that use somehow mandates its allowance and has been improperly subordinated to the goal that relates directly to the other use.

■ The major difference between this case and *Benjfran Development* for purposes of this issue is that, here, the decisionmaker whose order we review is LCDC, rather than the Land Use Board of Appeals. As we have previously explained in *Oregonians in Action v. LCDC*, 121 Or App 497, 854 P2d 1010, *rev den* 318 Or 170 (1993), LCDC has broad remedial powers in the periodic review setting as an adjunct of its authority to adopt and implement land use policy. We find no legal basis for reversing its judgment in the arguments that petitioners derive from the statutory and regulatory economic provisions.

■ Similarly, LCDC also has broad rulemaking authority. As the Supreme Court explained in *Lane County*:

> "The legislature created LCDC to ensure consistent and comprehensive land use planning and to promote coordinated statewide land conservation and development. ORS 197.005. To accomplish those purposes, the legislature invested LCDC with broad policy-making and regulatory authority. It directed LCDC to set goals and standards for land use and declined to set the land use planning goals itself. As the court stated in *1000 Friends v. LCDC*, 292 Or 735, 744, 642 P2d 1158 (1982):
>
> " 'The legislature might have enacted permanent goals, but it chose not to. Rather, it enacted broad policies and delegated to a new agency, LCDC, legislative authority to refine and particularize those policies by adoption of land use goals and rules.'
>
> "* * * * *
>
> "LCDC is authorized to adopt, by rule or by goal, '*any* statewide land use policies that it considers necessary to carry out ORS chapter [ ] * * * 197.' ORS 197.040(1)(c) (emphasis added)." 325 Or at 581.

Given its view of LCDC's policymaking powers, the court concluded in *Lane County* that the agency had acted within its authority by adopting rules that imposed restrictions on certain uses on agricultural land that the court had earlier held

in *Brentmar v. Jackson County*, 321 Or 481, 900 P2d 1030 (1995), were permitted outright as a matter of state *statute*.

Petitioners nevertheless argue that the amendments to Goal 5 and the implementing rule here exceed LCDC's authority. They rely on *1000 Friends v. LCDC*, 292 Or 735, 642 P2d 1158 (1982), where the court invalidated an amendment to Goal 14 that purported to allow municipalities to make their UGBs coextensive with city boundaries. The court reasoned that that amendment was inconsistent with a perceived statutory requirement

> "that the full range of affected public interests be considered in the process of comprehensive planning for land use decisions. That requirement is offended by a goal which would make substantial areas of land available for urban development for the sole reason that they are within city boundaries." *Id.* at 750 (footnote omitted).

Assuming that *1000 Friends* survives *Lane County*,[5] it does not extend to the circumstances of this case. In *1000 Friends*, the court reasoned that there was a facial inconsistency between LCDC's action and the applicable statutes and goals. Conversely, as we have discussed above, LCDC's action here was not inconsistent with the specific terms of applicable goals and rules. As petitioners argue, LCDC did make a policy judgment that balanced, and to some extent prioritized, values and objectives under the goals. However, that was a judgment that LCDC was authorized to make. Whether LCDC's action here is appropriate from a policy standpoint is a matter for LCDC, not this court. What petitioners are effectively asking us to do is to judicially usurp LCDC's legislative policymaking authority. We decline to do so.

Affirmed.

---

[5] *1000 Friends* was disavowed in a related respect, but not the precise one that is relevant here, in *Branscomb v. LCDC*, 297 Or 142, 147, 681 P2d 124 (1984).