Argued and submitted August 5, affirmed November 4, 2002

## HOMEBUILDERS ASSOCIATION OF METROPOLITAN PORTLAND,
*Petitioner,*

*v.*

## METRO
and 1000 Friends of Oregon,
*Respondents.*

2001-197; A118382

57 P3d 204

Wendie L. Kellington argued the cause and filed the brief for petitioner.

Richard P. Benner argued the cause and filed the brief for respondent Metro.

No appearance for respondent 1000 Friends of Oregon.

Before Kistler, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.

DEITS, C. J.

## DEITS, C. J.

Petitioner seeks review of a Land Use Board of Appeals (LUBA) final opinion and order affirming a Metropolitan Service District (Metro) ordinance amending its Regional Framework Plan (RFP) and the Metro Code (MC). The amended provisions specify the available processes for changing the Metro Urban Growth Boundary (UGB). The effect of the amendments is that only Metro may initiate a change in the UGB to accommodate housing needs. Petitioner challenges LUBA's conclusion that the new enactments do not violate certain constitutional, statutory, and regulatory requirements. We affirm.

The basic facts and statement of the applicable statutory law are not in dispute. Metro is a regional government that is responsible for the urban growth boundary for a number of cities, including Portland. As a land use planning jurisdiction, Metro must submit its RFP to the Land Conservation and Development Commission (LCDC) for review for compliance with Statewide Land Use Planning Goals. ORS 197.274. Goal compliance is an ongoing responsibility, and Metro also must submit its plan and implementing ordinances to LCDC for periodic review. Periodic review is governed by ORS 197.628 to 197.650.

In 1995, the legislature adopted ORS 197.296.[1] Or Laws 1995, ch 547, § 3. That statute provides that, at periodic

---

[1] ORS 197.296 was amended in 2001. Or Laws 2001, ch 908, § 1. It now provides, in relevant part:

"(2) At periodic review pursuant to ORS 197.628 to 197.650 or at any other legislative review of the comprehensive plan or regional plan that concerns the urban growth boundary and requires the application of a statewide planning goal relating to buildable lands for residential use, comprehensive plans or regional plans shall provide sufficient buildable lands within urban growth boundaries established pursuant to statewide planning goals to accommodate estimated housing needs for 20 years. The 20-year period shall commence on the date initially scheduled for completion of the periodic or legislative review.

"(3) In performing the duties under subsection (2) of this section, a local government shall:

"(a) Inventory the supply of buildable lands within the urban growth boundary and determine the housing capacity of the buildable lands; and

"(b) Conduct an analysis of housing need by type and density range, in accordance with ORS 197.303 and statewide planning goals and rules relating to housing, to determine the number of units and amount of land needed for each needed housing type for the next 20 years."

review under ORS 197.628 to 197.650 or at any other legislative review of a comprehensive plan or regional plan that concerns the UGB and affects buildable lands available for residential use, the comprehensive or regional plan must provide sufficient buildable lands within the UGB to accommodate estimated housing needs for 20 years.

In 1997, the legislature adopted ORS 197.299. Or Laws 1997, ch 763, § 2. That statute imposes additional requirements on Metro. Under ORS 197.299,[2] Metro must undertake the evaluation called for in ORS 197.296 no later than January 1, 1998, and reconduct that analysis at least every five years. In addition, ORS 197.301 requires that "at least" once every two years, Metro must report to LCDC on the "performance measures" taken to consider facts relevant to housing, vacant land, and related matters. Further, Metro must take "corrective action" to increase the supply of buildable land available for housing between the five-year periods if its previous actions to increase land supply have not been effective. ORS 197.302. In sum, the statutes call upon Metro

---

[2] ORS 197.299 was also amended in 2001. Or Laws 2001, ch 908, § 2. It now provides:

"(1) A metropolitan service district organized under ORS chapter 268 shall complete the initial inventory, determination and analysis required under ORS 197.296(3) not later than January 1, 1998, and conduct the inventory and analysis at least every five years thereafter.

"(2)(a) The metropolitan service district shall take such action as necessary under ORS 197.296(6)(a) to accommodate one-half of a 20-year buildable land supply determined under ORS 197.296(3) within one year of completing the analysis.

"(b) The metropolitan service district shall take all final action under ORS 197.296(6)(a) necessary to accommodate a 20-year buildable land supply determined under ORS 197.296(3) within two years of completing the analysis.

"(c) The metropolitan service district shall take action under ORS 197.296(6)(b), within one year after the analysis required under ORS 197.296(3)(b) is completed, to provide sufficient buildable land within the urban growth boundary to accommodate the estimated housing needs for 20 years from the time the actions are completed. The metropolitan service district shall consider and adopt new measures that the governing body deems appropriate under ORS 197.296(6)(b).

"(3) The Land Conservation and Development Commission may grant an extension to the time limits of subsection (2) of this section if the Director of the Department of Land Conservation and Development determines that the metropolitan service district has provided good cause for failing to meet the time limits."

to continually monitor the supply of buildable land for housing and other needs and take action as needed to ensure a 20-year supply of such land within the UGB.

Metro adopted the ordinance that is challenged here, Ordinance 01-929A, to implement the requirement of ORS 197.299 that Metro inventory and analyze its supply of land every five years. Ordinance 01-929A amended RFP section 1.9.3 in ways discussed below. 184 Or App at 668. The preamble to the ordinance explains its purpose: namely, that Metro wants to ensure the availability of a procedure to amend the UGB between the required five-year reviews in order to address unanticipated needs that cannot wait until the next review. The ordinance adds that it takes effect immediately, "because processing and reviewing major amendments and locational adjustments under the current code is drawing staff and Council resources away from Metro's legislative review of the UGB, which Metro must complete to meet the requirements of ORS 197.299 and periodic review before LCDC." In other words, the change was made because the existing scheme inhibited Metro's ability to fulfill its statutory responsibilities relating to the establishment and maintenance of the UGB.

Ordinance 01-929A makes significant changes to available procedures for making adjustments to the UGB. LUBA accurately describes this change:

"Prior to the challenged decision, Metro's code authorized five ways in which the Metro UGB might be amended: a legislative process initiated by Metro and four distinct types of quasi-judicial procedures, initiated by cities, counties, special districts or property owners. Quasi-judicial amendments included, in relevant part, major amendments and locational adjustments. Under *former* MC 3.01.033, applications for quasi-judicial major or locational amendments could only be filed between February 1 and March 15 each year. Under *former* MC 3.01.030, nothing prohibited a local government, special district or property owner from filing an application for a quasi-judicial UGB amendment in order to address housing needs."

(Footnote omitted.)

Ordinance 01-929A does not change the legislative process for amending the UGB. MC 3.01.015. However, as LUBA noted, only two quasi-judicial processes for amending the UGB remain, and neither allows local governments, special districts, or property owners to seek a UGB amendment to satisfy housing needs. Section 1.9.3 of the RFP now provides that a quasi-judicial process may be employed to add land to the UGB by a local government, special district, or property owner but only for certain nonhousing needs, specifically,

> "to add land to the UGB for public facilities, public schools, natural areas and those nonhousing needs that (a) were not accommodated in the most recent five-year analysis of land supply pursuant to ORS 197.299(1) and (b) must be addressed prior to the next five-year analysis."

RFP § 1.9.3(1).[3]

A quasi-judicial process may also be employed for "minor adjustments" to the UGB, but the minor adjustments permitted are limited to "siting public facility lines and roads, for land trades and to make the UGB coterminous with nearby property lines or natural or built features in order to make the UGB function more efficiently and effectively." RFP § 1.9.3(2).[4] As LUBA concluded, "[t]he net effect of * * * amendments is that the only vehicle to amend the UGB to address housing needs under Metro's code is by means of a legislative amendment initiated by Metro, pursuant to MC 3.01.015."

---

[3] This type of amendment is processed under the Metro Code as a major amendment. MC 3.01.025. The criteria for a major amendment are specified in MC 3.01.030.

[4] MC 3.01.035, which implements this provision states, in relevant part:

"(a) The purpose of this section is to provide a mechanism to make small changes to the UGB in order to make it function more efficiently and effectively. It is not the purpose of this section to add land to the UGB to satisfy a need for housing or employment. This section establishes criteria that embody state law and Regional Framework Plan policies applicable to boundary adjustments.

"(b) Metro may adjust the UGB under this section only for the following reasons: (1) to site roads and lines for public facilities and services; (2) to trade land outside the UGB for land inside the UGB, or (3) to make the UGB coterminous with nearby property lines or natural or built features."

Petitioner argued before LUBA that Ordinance 01-929A was invalid because it was inconsistent with State-wide Land Use Planning Goal 1 (Citizen Involvement), Goal 2 (Land Use Planning), Goal 10 (Housing), and Goal 14 (Urbanization); the Metro charter; Oregon Administrative Rules chapter 660, division 007, governing Metro housing; statutes addressing housing; and statutes addressing UGB amendments for housing. In addition, petitioner asserted that Ordinance 01-929A violated the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution and Article I, section 20, of the Oregon Constitution. Finally, petitioner claimed that Ordinance 01-929A retaliates against petitioner's members for exercising their rights to political speech and to petition the government.

LUBA rejected all of petitioner's arguments. It concluded that there was nothing in Oregon's statutory land use scheme that required Metro to provide a quasi-judicial means to amend the UGB, particularly when considering the availability of five-year reviews mandated in ORS 197.299. It also held that the amendments did not violate the Goals and concluded that no federal or state constitutional requirement mandates that a quasi-judicial process be available to amend the UGB. LUBA concluded that the timetable set out in ORS 197.299 for review of housing needs obviated any legal necessity, if one existed, for a process for quasi-judicial amendment to the UGB.

Petitioner seeks review of LUBA's rejection of its position and asserts essentially the same grounds for reversal of LUBA's decision that it presented to LUBA in support of its challenges to Ordinance 01-929A. We agree with LUBA's disposition and analysis of petitioner's arguments. We address what we understand to be petitioner's principal argument that Metro's limitation of the available processes for amending the UGB to provide land for housing is inconsistent with its obligation to maintain an adequate supply of land for housing. We consider the issue here, because it has not previously been addressed by this court.

Petitioner contends that Metro has an obligation to maintain a continuously adequate supply of land for housing

in the Metro area and that Metro's limitation on the processes available to make adjustments in the UGB to accommodate identified housing needs is inconsistent with that obligation. Specifically, petitioner contends that, without the availability of a quasi-judicial process that may be initiated by parties other than Metro, the obligation to furnish an adequate supply of land for housing simply cannot be met. In making that argument, petitioner does not identify any particular enactment requiring Metro to use any specific procedures to meet its obligation to ensure an adequate supply of buildable land for residential use.[5] Rather, petitioner argues that the requirement that Metro provide a quasi-judicial amendment process is implicit in the rules related to Goal 10 and other sources of law governing planning obligations relating to housing needs. Petitioner asserts that, without the availability of a quasi-judicial UGB amendment process, there is no means to remedy an unexpected housing need arising out of mistakes in housing estimates or other circumstances. The result, according to petitioner, is a violation of Goal 10 (Housing), Goal 14 (Urbanization), and Metro's statutory responsibility to provide a UGB of sufficient size to accommodate needed housing.

It is, however, a fundamental and well-established principle of law in Oregon that land use law is governed by statutes. As early as 1978, the Supreme Court explained, in *Anderson v. Peden*, 284 Or 313, 315, 587 P2d 59 (1978), that

"[z]oning law is not common law but a branch of state and local legislation and administrative law, created by particular statutes, rules, charters, comprehensive plans, ordinances, and resolutions, and the criteria governing such matters as 'conditional uses' must be sought there rather than in cases from other cities, counties, or states."

(Footnote omitted.) As the Supreme Court later observed, "[l]and use planning and regulation in Oregon occurs within

---

[5] The purpose of Goal 10, on which petitioner relies, is to provide for "the housing needs of the citizens of the state." Goal 10 provides, in relevant part:

"Buildable lands for residential use shall be inventoried and plans shall encourage the availability of adequate numbers of needed housing units at price ranges and rent levels which are commensurate with the financial capabilities of Oregon households and allow for flexibility of housing location, type and density."

a framework enacted in 1973 as Senate Bill 100 which, with some amendments, now appears as ORS ch 197." *1000 Friends v. LCDC*, 292 Or 735, 744-45, 642 P2d 1158 (1982) (footnote omitted). "The impetus behind Senate Bill 100, codified in ORS chapter 197, the framework within which land use planning occurs, was legislative concern that state intervention was needed to stop a process of cumulative public harm resulting from uncoordinated land use." *1000 Friends of Oregon v. Wasco County Court*, 299 Or 344, 347, 703 P2d 207 (1985) (citing *1000 Friends of Oregon v. LCDC*, 292 Or at 745).

Notwithstanding petitioner's view that an implicit requirement exists that Metro must provide a quasi-judicial process to address the adequacy of housing and the UGB, the only clear legal source of a timetable for Metro's obligation to review housing needs and its UGB is found in ORS 197.299, ORS 197.301, and ORS 197.302. Those statutes require Metro to perform certain analyses and reviews of its framework plan and implementing measures on a frequent basis. However, there simply is no requirement in those statutes that Metro make available a quasi-judicial process for doing so or that Metro permit private parties or constituent local governments to initiate such reviews.

Further, as LUBA articulately explained, petitioner did not establish that Metro cannot meet its responsibilities without the availability of a quasi-judicial process:

> "Metro's decision relies on the five-year review mandated by ORS 197.299 to obviate any necessity for quasi-judicial UGB amendments directed at housing needs. Metro's brief points out that the Metro Council can initiate a legislative amendment to amend the UGB at any time it determines there is need to do so, in addition to the five-year reviews mandated by ORS 197.299. MC 3.01.015(c). Metro also argues, and petitioner does not dispute, that local governments, special districts and citizens can petition the Metro Council to initiate a UGB amendment for any reason at any time. Aside from petitioner's speculation, Metro argues, there is no reason to presume that the Metro Council would fail to act, if it determined that a housing need exists that should be addressed prior to the next five-year review. Given the five-year review timetable at ORS

197.299, Metro's ability to initiate a UGB amendment at any time, and the ability of interested parties to petition Metro to amend the UGB, Metro argues that it is highly unlikely that the supply of residential land within the regional UGB as a whole could be diminished to the point where Metro can be said to have failed its obligations under the cited goals, rules and statutes. Therefore, Metro argues, a quasi-judicial UGB amendment procedure for housing is not essential to ensure compliance with any of the cited goals, rules or other applicable law.

"We agree that petitioner has not established that the availability of a quasi-judicial UGB amendment procedure for housing is essential to ensure that the regional UGB as a whole continues to comply with applicable law. ORS 197.299 contemplates some delay between Metro's initial determination that the regional UGB contains a 20-year supply of residential land and subsequent reviews and actions based on those reviews. We do not see why, given the timetable imposed by ORS 197.299, a quasi-judicial UGB amendment process is necessary to ensure that the UGB as a whole contains a sufficient amount of residential land."

(Footnote omitted.)

In arguing that a quasi-judicial process is necessary, petitioner also relies on decisions of the Supreme Court and this court discussing quasi-judicial procedures and the right of parties to present and rebut evidence. *See, e.g., Strawberry Hill 4 Wheelers v. Benton Co. Bd. of Comm.*, 287 Or 591, 602-12, 601 P2d 769 (1979); *ODOT v. City of Mosier*, 161 Or App 252, 259, 984 P2d 351 (1999). The problem with petitioner's argument, however, is that the authorities on which it relies concern circumstances in which the focus was not on whether a quasi-judicial proceeding was required but, rather, what procedures must be used in a quasi-judicial process. As discussed above, in this case, there is no statute, rule, or other legal authority requiring Metro to provide a quasi-judicial procedure as part of its obligation to enact, periodically examine, and amend the UGB.

It is conceivable that Metro might undertake a proceeding to amend a portion of its UGB that will be so circumscribed and directed at such a limited number of land interests that employment of quasi-judicial safeguards may be

necessary. *See Neuberger v. City of Portland*, 288 Or 155, 160-67, 603 P2d 771 (1980) (discussing quasi-judicial procedures); *Hitchcock v. McMinnville City Council*, 291 Or 404, 631 P2d 777 (1981) (same).[6] Nonetheless, the possibility that particular circumstances may require that such safeguards be employed is not legal authority for a requirement that Metro *must* provide a quasi-judicial process that permits interested parties to require Metro to *initiate* a quasi-judicial process to consider a particular amendment request.

In summary, petitioner's desire for the availability of a quasi-judicial process to deal with adjustments to the UGB to meet housing needs may be based on legitimate practical and policy considerations. Nonetheless, land use regulation in Oregon is a creature of statute. The Oregon legislature has specified Metro's obligations relating to UGB amendments and the requirement to satisfy identified housing needs, and those obligations do not require that Metro use the procedures that petitioner would like Metro to use. LUBA did not err in its disposition of petitioner's arguments on this question. We also conclude that LUBA's disposition of petitioner's other arguments was correct, and we affirm without discussion.

Affirmed.

---

[6] We hasten to caution, however, that a legislative expansion of the UGB that includes a number of small tracts and individual owners does not necessarily convert a legislative decision into a quasi-judicial decision. *D. S. Parklane Development, Inc. v. Metro*, 165 Or App 1, 15-16 n 4, 994 P2d 1205 (2000).