239 P.3d 272 (2010)
237 Or. App. 213
1000 FRIENDS OF OREGON; Friends of Marion County; Lolita Carl; Kathleen Carl; Diane Mikkelson; Carla Mikkelson; and Marion County Farm Bureau, Petitioners,
v.
LAND CONSERVATION AND DEVELOPMENT COMMISSION; Opus Northwest, LLC; City of Woodburn; Fessler Family, LLC; Marion County; and Renaissance Custom Homes, LLC, Respondents.
07WKTASK001720; A135375.
Court of Appeals of Oregon.
Argued and Submitted May 28, 2009.
Decided September 8, 2010.
*273 Mary Kyle McCurdy, Portland, argued the cause and filed the briefs for petitioners.
Robin Rojas McIntyre, Assistant Attorney General, argued the cause for respondent Land Conservation and Development Commission. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Corinne C. Sherton, Portland, argued the cause for respondent Opus Northwest, LLC. With her on the brief was Johnson & Sherton, PC.
N. Robert Shields argued the cause for respondents City of Woodburn and Marion County. With him on the joint brief was Jane Ellen Stonecipher.
No appearance for respondent Fessler Family, LLC.
No appearance for respondent Renaissance Custom Homes, LLC.
Before HASELTON, Presiding Judge, and ARMSTRONG, Judge, and ROSENBLUM, Judge.
HASELTON, P.J.
Petitioners seek judicial review of an order of the Land Conservation and Development Commission (LCDC) approving the City of Woodburn's amendment of its urban growth boundary (UGB) to include an additional 409 acres for industrial uses.[1] Petitioners' myriad contentions on review pertain to two basic issues. First, did the city include more industrial land in its UGB than was necessary to accommodate its needs over the 20-year planning period in violation of Statewide Land Use Planning Goals 9 and 14? Second, assuming that there was a need for the additional industrial land, should the city have selected different properties for inclusion in the UGB pursuant to ORS 197.298 and the locational factors in Goal 14? For reasons that we will explain, we conclude that the LCDC's order is inadequate for judicial review with respect to its treatment of the first of those two issues, and, accordingly, reverse and remand the order for reconsideration, which, in turn, obviates the need to address the second issue.
*274 We begin by describing the legal framework that provides the necessary context for understanding the parties' contentions in this case. "Oregon's statewide land use planning goals, adopted by [LCDC], set out broad objectives for land use planning in Oregon." Save Our Rural Oregon v. Energy Facility Siting, 339 Or. 353, 361, 121 P.3d 1141 (2005). In this case, two goalseach designed to promote a different policypertain to the parties' dispute concerning the expansion of the city's UGB.
Goal 9 pertains to economic development and is designed "[t]o provide adequate opportunities throughout the state for a variety of economic activities vital to the health, welfare, and prosperity of Oregon's citizens." Towards that end, it provides that comprehensive plans shall "[p]rovide for at least an adequate supply of sites of suitable sizes, types, locations, and service levels for a variety of industrial and commercial uses consistent with plan policies[.]" (Emphasis added.)
Among Goal 9's implementing rules is OAR XXX-XXX-XXXX, which prescribes measures for the identification and designation of lands for industrial uses. Pursuant to that rule, a comprehensive plan must not only "identify the approximate number, acreage and site characteristics of sites needed to accommodate industrial and other employment uses to implement plan policies," OAR XXX-XXX-XXXX(1) (emphasis added), but also "designate serviceable land suitable to meet the site needs identified in section (1) of this rule," OAR XXX-XXX-XXXX(2) (emphasis added). Generally, "the total acreage of land designated must at least equal the total projected land needs for each industrial or other employment use category identified in the plan during the 20-year planning period." Id.
Goal 14, which concerns urbanization, is designed "[t]o provide for an orderly and efficient transition from rural to urban land use."[2] Specifically, the goal provides that the establishment and change of a UGB shall be based on two "need factors":
"(1) Demonstrated need to accommodate long range urban population, consistent with a 20-year population forecast coordinated with affected local governments; and
"(2) Demonstrated need for housing, employment opportunities, livability or uses such as public facilities, streets and roads, schools, parks or open space, or any combination of the need categories in this subsection (2).
"In determining need, local government[s] may specify characteristics, such *275 as parcel size, topography or proximity, necessary for land to be suitable for an identified need.
"Prior to expanding an urban growth boundary, local governments shall demonstrate that needs cannot reasonably be accommodated on land already inside the urban growth boundary."
Generally, and consistently with Goal 14, "a local government is not permitted to establish an urban growth boundary containing more land than the locality `needs' for future growth." City of Salem v. Families For Responsible Govt., 64 Or.App. 238, 243, 668 P.2d 395 (1983), rev'd and rem'd on other grounds, 298 Or. 574, 694 P.2d 965 (1985).
Further, this case implicates both Goal 9 and Goal 14. As we have noted in previous cases, "[t]here is, of course, no doubt that different statewide planning goals promote different land use values and, necessarily, there is some operational tension among them." Port of St. Helens v. LCDC, 165 Or.App. 487, 496, 996 P.2d 1014, rev. den., 330 Or. 363, 6 P.3d 1104 (2000). As pertinent in this case, in Benjfran Development v. Metro. Service Dist., 95 Or.App. 22, 26, 767 P.2d 467 (1989), we reasoned that economic development as contemplated in Goal 9 cannot preempt the requirements of Goal 14.[3] In other words, even if a local government designates a needed supply of industrial land for use over the 20-year planning period consistently with Goal 9, an amendment to the UGB cannot be accomplished without demonstrating compliance with the requirements of Goal 14.
With that background in mind, we return to the undisputed, procedural facts of this case. In the late 1990s, the city began the periodic review process to update its comprehensive plan and other planning documents through 2020that is, the end of the planning period.[4]
As part of that periodic review process, the city completed various work tasks. In addition, the city amended its UGB. That amendment expanded the UGB by over 900 acres, including 409 acres for industrial uses.
The expansion related to the 409 acres for industrial uses was predicated on the city's identification of an economic development strategy during the periodic review process to target specific high-wage industries that might reasonably locate in the city because of its comparative advantages over other locations. In developing that strategy, the city completed various studies and analyses, including those related to population and employment projections, economic opportunities, *276 economic development strategies, industrial land needs, and site requirements for the targeted industries.
In the economic opportunities analysis, the city examined various factors affecting the city's comparative ability to attract industry (e.g., location, natural resources, buildable lands, labor force, housing, transportation). Based on those factors, as well as national and local trends, the city determined that it had a comparative advantage in attracting 13 specific industries.[5] The city then identified the site and building requirements for those targeted industries. Ultimately, the city determined that, to further its economic development strategy, it needed 42 total additional industrial sites, which ranged in size from less than two acres to 100 or more acres.[6]
In the Woodburn UGB Justification Report, to which LCDC ultimately referred in the order on review, the city explained the reasons that it needed the additional industrial sites:
"Goal 14, Land Need factor (2), recognizes that changes to a UGB may be based on [a] demonstrated need for employment opportunities.
"* * * *
"The employment land needs analysis in ECONorthwest's `Site Requirements for Woodburn Target Industries' (October 2003) concluded that about 370 acres would need to be developed for basic employment uses to accommodate a mid-range need of 7,140 new employees between 2000 and 2020, based on employee-per-acre ratios. However, to attract targeted industries Woodburn must provide choice among and an adequate inventory of suitable sites. Under the site suitability method, it is possible that some sites may not fully develop during the planning period, either because a portion of the site will be held for future development or because a reserved site will not be selected by a targeted industry. As noted below, the proposed Plan includes measures to ensure that designated industrial parcels remain in agricultural use until a targeted employer needs them. Plan measures also ensure that such parcels cannot be re-designated for commercial use.
"Woodburn's employment land needs are designed to meet ORS 197.712 and the Goal 9 Rule (OAR Chapter 660, Division 009) requirements that cities `identify the types of sites that are likely to be needed by industrial and commercial uses which might expand or locate in the planning area.' To be clear, industrial site needs are not based on floor-area ratios or employee per acre ratios. Table 1[, which identifies the need for 42 sites,] includes a select group of sites that have a reasonable likelihood of meeting the needs of targeted employers. This group of sites totals slightly less than 500 acres."
(Footnotes omitted; underscoring in original; emphasis added.) In sum, the city determined that the 42 sites were necessary to provide market choice and an adequate inventory of land to accommodate the siting requirements of the targeted industries.
Petitioners filed objections to the UGB amendment with the Department of Land Conservation and Development (DLCD). Although Petitioner 1000 Friends of Oregon (Friends) made several specific and pointed objections concerning the UGB amendment, it summarized its position by contending that
"[m]uch of Woodburn's UGB expansion is based on a very aggressive industrial development strategy. * * * It has included far more industrial land within its amended boundary than is needed to accommodate that projected industrial job growth, more industrial land than is needed to accommodate its target industries, and *277 more industrial land than it expects to develop over the 20-year planning period."
(Emphasis added.)
Friends of Marion County succinctly elaborated on that general concern by asserting that the targeted industries approach utilized by the city "inflates the number of acres to be included in the proposed UGB expansion for industrial job growth" and "does not address the demonstrated need for any additional industrial land to be included in the proposed UGB expansion as required by Goal 14." Further, Friends of Marion County noted that the city included more than a 20-year supply of industrial land in its UGB amendment, in violation of Goal 9 and its implementing rules. After receiving those objections, DLCD's director referred the UGB amendment to LCDC for consideration.
In the findings that accompanied its order, LCDC began by describing the expansion of the UGB to include land for industrial uses:
"The city included 409 acres of land in the amended UGB for industrial uses. * * * The city performed a 2020 employment projection, an Industrial Land Needs Analysis, and a refined Target Industry Site Suitability as well as an Economic Opportunities Analysis (EOA) and Economic Development Strategy (EDS). In these documents, the city established the need for 409 acres of industrial land, and the analyses address site sizes, types, and locations as required by OAR XXX-XXX-XXXX."[7]
(Record citations omitted.) LCDC then addressed petitioners' objections. As pertinent here, LCDC stated that the Woodburn UGB Justification Report
"identif[ied] the total number of sites required for all the site size needs, and [found] 42 total sites needed for all targeted industries. According to 1000 Friends, this is an oversupply of sites that leads to more land than is justified. However, the city has designated these sites to provide for the required short-term supply as well as to provide market choice among sites. The Commission finds that this is a key component of a successful industrial development strategy, and is required by OAR XXX-XXX-XXXX. In addition, the objection states that the city acknowledges that `not all of the industrial land proposed for inclusion is expected to develop by 2020.' This is due to the fact that industrial users often choose to purchase a site larger than their immediate need in order to ensure that they have adequate land for future expansion, and the statement referred to by the objector is recognition of that fact. Additionally, OAR 660-009-[0]025(2) specifies that plans must designate serviceable land suitable to meet the site needs identified in Section (1) of this rule. Except as provided for in Section (5) of this rule, the total acreage of land designated must at least equal the total projected land needs for each industrial or other employment use category identified in the plan during the 20-year planning period.
"* * * *
"In conclusion, the Commission finds that Woodburn's plans for economic development comply with the Goal 9 and Goal 14 rules. The city's employment projection and land needs assessment are reasonable, for reasons explained in these findings and more particularly described in the Woodburn UGB Justification Report[.]"
(Emphasis added.)
Significantly, although LCDC discusses Goal 9 and its implementing rules and concludes that the UGB amendment complies with both Goals 9 and 14, LCDC provided essentially no reasoning as to that conclusion with respect to Goal 14. In particular, LCDC offered no explanation concerning the reasons that the need factors of Goal 14 are satisfied under the circumstances of this case.
Ultimately, LCDC issued an order affirming the UGB amendment.[8] Petitioners *278 sought judicial review of that order in this court.
On review, petitioners raise three assignments of error. The first concerns the propriety of the UGB amendment. The remaining assignments concern the city's selection of specific properties for inclusion in the UGB.
Reduced to its core, petitioners' first assignment of error pertains to a single, basic legal issuethat is, whether the city included more industrial land in the UGB than it would need over the 20-year planning period in violation of Goals 9 and 14. With regard to that legal issue, petitioners acknowledge the legitimacy of a "targeted industries" approach to economic development because "there is nothing inherent in [that approach] that requires exceeding the 20-year land supply." Nonetheless, they contend on review, as they did in their objections to DLCD and before LCDC, that the city's application of a targeted industries approach in this case resulted in a UGB amendment that includes "industrial lands far exceeding the 20-year planning period described by law."
Further and relatedly, petitioners assert that, although LCDC "justifies this oversupply by stating that it is required by OAR XXX-XXX-XXXX * * * to provide market choice among sites," "there is nothing in Goals 14 or 9 that allows the 20-year UGB land supply to be exceeded to provide for market choice." (Internal quotation marks omitted.) According to petitioners, that justification is legally insufficient.
We need not address the substance of petitioners' challenges because, as amplified below, we conclude that, in certain essential respects, LCDC's order does not provide an adequate basis for judicial review of those contentions. Marion County v. Federation For Sound Planning, 64 Or.App. 226, 237, 668 P.2d 406 (1983).
In Federation For Sound Planning, we held, in part, that
"[a] petitioner seeking judicial review under the terms of [ORS 197.650] must base the arguments on the objections (or the comments) filed with DLCD; those objections will therefore frame the issues on appeal. Unless we have [LCDC's] decisions on those issues before us, along with the bases for those decisions, we cannot perform the judicial review functions required by ORS 183.482."
64 Or.App. at 237, 668 P.2d 406. Further, we noted that our holding in that regard "simply extends to LCDC orders a rule that has long applied to the orders of other administrative agencies"that is, the rule of substantial reason. Id. at 237 n. 10, 668 P.2d 406. See Freeman v. Employment Dept., 195 Or.App. 417, 421, 98 P.3d 402 (2004) (providing that, pursuant to ORS 183.482(8)(a) to (c), "[w]e review the challenged finding for substantial evidence in the record and the legal conclusion for substantial reason and errors of law"); see also Drew v. PSRB, 322 Or. 491, 500, 909 P.2d 1211 (1996) ("[A]gencies also are required to demonstrate in their opinions the reasoning that leads the agency from the facts that it has found to the conclusions that it draws from those facts." (Emphasis in original.)).
In this case, as previously described, the basic objection before DLCD was that the city
"included far more industrial land within its amended boundary than is needed to accommodate that projected industrial job growth, more industrial land than is needed to accommodate its target industries, and more industrial land than it expects to develop over the 20-year planning period."
That objection embodied a fundamental concern that, because at least some of the 409 acres of land designated for industrial use was included to provide market choice and would not be developed during the 20-year planning period, the city included more land than was needed for industrial development over the planning period in violation of Goals 9 and 14.
In response, LCDC concluded that "the city established the need for 409 acres of industrial land" and that the inclusion of that acreage in the UGB "compl[ied] with the Goal 9 and Goal 14 rules." LCDC's justification for those conclusions appears to be that the 409 acres was needed, in part, "to provide *279 market choice among sites." That justification is inadequate to permit reasoned judicial review for two basic reasonsthe first pertaining to Goal 9 and the second to Goal 14.
First, with respect to Goal 9, LCDC's mere reference to "market choice" is insufficient to explain the reason that the city's UGB expansion in this case is consistent with that goal. Although LCDC may be correct that, in the abstract, "market choice" can be "a key component of a successful industrial development strategy" as required by OAR XXX-XXX-XXXX, "market choice" is an infinitely pliable and elastic term-and all forms and degrees of market choice are not necessarily consistent with Goal 9. As an extreme example, it is unlikely that a local government that sought to target a single industry with a projected 10-acre site need, could, consistently with Goal 9 and its implementing rules, designate hundreds of 10-acre industrial sites and amend its UGB accordingly simply because it wanted to provide optimally attractive "market choice." Bluntly, "market choice" without amplification is a label without reasoning. Here, given the variety of the industries that the city targeted and the diversity and multiplicity of the sites that the city designated, it is incumbent on LCDC to cogently explain the reasons that the degree of market choice employed by the city in this case is consistent with the requirements of Goal 9 and OAR XXX-XXX-XXXX.
Second, with respect to Goal 14, LCDC concluded, summarily, that the city established a need for 409 acres and that the UGB amendment was consistent with that goal. However, despite the fact that, generally, "a local government is not permitted to establish an urban growth boundary containing more land than the locality `needs' for future growth," Families For Responsible Govt, 64 Or.App. at 243, 668 P.2d 395, LCDC did not explain the reasons why a UGB that includes more industrial land than will be developed during the planning period is consistent with Goal 14. In fact, as previously described, LCDC does not refer to or explain how the Goal 14 need factors are satisfied in this case. Further, as we have previously emphasized, compliance with Goal 9 does not necessarily establish compliance with Goal 14. Benjfran Development, 95 Or.App. at 26, 767 P.2d 467. Here, because petitioners objected to the UGB amendment asserting that it violated both Goal 9 and Goal 14, it is incumbent on LCDC to explain the reasons that, even if the UGB amendment is consistent with the economic development principles in Goal 9, it is also consistent with the requirements for urbanization specified in Goal 14.
In sum, because LCDC did not adequately explain the reasons that the UGB amendmentwhich included more industrial land than will be developed during the planning period so that the city could provide for market choice among siteswas consistent with both Goals 9 and 14, its order failed to respond to petitioners' objections and is inadequate for judicial review as it pertains to petitioners' first assignment of error concerning the propriety of the UGB amendment. Accordingly, we reverse and remand the order for reconsideration. That disposition obviates the need to address petitioners' remaining assignments of error, which concern the city's selection of specific properties for inclusion in the UGB and are ultimately derivative of the first assignment of error.
Reversed and remanded for reconsideration.
NOTES
[1] A city, such as Woodburn, "with a population of 2,500 or more within its urban growth boundary that amends the urban growth boundary to include more than 50 acres * * * shall submit the amendment or designation to [LCDC] in the manner provided for periodic review * * *." ORS 197.626. In turn, LCDC's resulting "order may be appealed to the Court of Appeals in the manner provided in ORS 183.482"that is, the provision in the Oregon Administrative Procedures Act concerning review of contested cases. ORS 197.650(1).
[2] Goal 14 was amended on April 28, 2005. Those amendments were not effective until April 28, 2006. Specifically, the applicability provisions of the Goal 14 amendments provide, in part:

"(1) Goal 14 and related Statewide Goal Definitions, as amended on April 28, 2005, * * * are applicable to the adoption or amendment of a comprehensive plan or land use regulation, or a land use decision made under a non-acknowledged comprehensive plan or land use regulation, on and after April 28, 2006, except as follows:
"(a) Local governments are authorized, at their option, to apply the goal and related definitions as amended on April 28, 2005, to amendments to a comprehensive plan or land use regulation, or a land use decision made under a non-acknowledged comprehensive plan or land use regulation, on or after June 28, 2005.
"(b) Local governments that initiated an evaluation of the [UGB] land supply prior to April 28, 2005, and consider an amendment of the UGB based on that evaluation, are authorized, at their option, to apply Goal 14 and related definitions as they existed prior to April 28, 2005, to the adoption of such UGB amendment regardless of the adoption date of such amendment."
In this case, the city applied the version of Goal 14 that became effective in April 2006 because it appears to have understood that those amendments became effective on June 28, 2005, before its decision in October of that year. Although the city misunderstood the effective date of the amendments, its decision was predicated on the version of Goal 14 that became effective in April 2006, and we understand the parties to agree that the city elected to apply the amended version of the goal. For that reason, in this opinion, we refer to the amended version of Goal 14.
Further, after the city amended its UGB and after LCDC issued its order, the Department of Land Conservation and Development promulgated rules to interpret the amended version of Goal 14. See OAR 660-024-0000-660-024-0080. In light of our disposition, we express no opinion concerning whether, or how, those rules inform the merits of the parties' contentions on review.
[3] Specifically, in Benjfran Development, we rejected the argument that "Goal 9 require[s] local governments to treat economic development as a per se need to expand their UGBs and that developmental objectives either supersede the first two [need] factors of Goal 14 or are incorporated into the second as the prevailing consideration," reasoning that,

"[w]hatever the full relationship may be between the statutory and regulatory economic development provisions and the Goal 14 need factors, the former do not completely preempt the latter, as petitioner seems to postulate. Under petitioner's theory, local governments would be required to find a need to urbanize land to accommodate every developmental proposal, regardless of the adequacy of currently urbanized or urbanizable land to serve the economic development requirements of the locality. Petitioner suggests no reason why its proposal answers a need or why the current economic circumstances within Metro's UGB leave a need to be answered. Stated differently, petitioner's argument can succeed only if Goal 9, [the statutes related to economic development,] or the implementing provisions which localities must adopt pursuant to the statutes mandate the approval of every land use proposal with potential beneficial economic effects. We hold that the argument does not succeed."
95 Or.App. at 25-26, 767 P.2d 467 (emphasis omitted).
[4] "The purpose of periodic review is to ensure that acknowledged comprehensive plans and land use regulations continue to achieve the statewide planning goals." Hummel v. LCDC, 152 Or.App. 404, 409, 954 P.2d 824, rev. den., 327 Or. 317, 966 P.2d 220 (1998). See also ORS 197.628-197.650 (describing the periodic review process). The periodic review process consists of two phases.

"The first phase involves `the evaluation of the existing comprehensive plan, land use regulations and citizen involvement program and, if necessary, the development of a work program to make needed changes to the comprehensive plan or land use regulations.' ORS 197.633(1). The second phase is `the completion of work tasks outlined in the work program.' Id."
City of West Linn v. LCDC, 201 Or.App. 419, 423, 119 P.3d 285 (2005).
[5] The city identified the following targeted industries: (1) "Printing and Publishing"; (2) "Stone, Clay & Glass"; (3) "Fabricated Metal"; (4) "Industrial Machinery & Equipment"; (5) "Electronic and Electric Equipment"; (6) "Transportation Equipment"; (7) "Trucking & Warehousing"; (8) "Wholesale Trade: Durables"; (9) "Wholesale Trade: Nondurables"; (10) "Nondepository Institutions"; (11) "Business Services"; (12) "Health Services"; and (13) "Engineering & Management."
[6] Specifically, the city itemized the sites as follows: 1 site of 100 or more acres; 1 site of 50 to 100 acres; 3 sites of 25 to 50 acres; 5 sites of 10 to 25 acres; 7 sites of 5 to 10 acres; 10 sites of 2 to 5 acres; and 15 sites of less than 2 acres.
[7] OAR XXX-XXX-XXXX requires that certain local governments "must review and, as necessary, amend their comprehensive plans to provide economic opportunities analyses containing" particular information.
[8] LCDC's order also approved a periodic review work task concerning the city's commercial and industrial lands inventory.