Argued and submitted March 15, 2013, reversed and remanded for
reconsideration January 2, petition for review denied May 8, 2014 (355 Or 380)

## 1000 FRIENDS OF OREGON,
Friends of Marion County, Lolita Carl,
Kathleen Carl, Diane Mikkelson,
and Marion County Farm Bureau,
*Petitioners,*

*v.*

## LAND CONSERVATION AND
## DEVELOPMENT COMMISSION;
City of Woodburn;
and Marion County,
*Respondents.*

Land Conservation and Development Commission
11WKTASK001802; A148592

317 P3d 927

Mary Kyle McCurdy argued the cause and filed the briefs for petitioners.

Patrick M. Ebbett, Senior Assistant Attorney General, argued the cause for respondent Land Conservation and Development Commission. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

N. Robert Shields argued the cause for respondent City of Woodburn. With him on the joint brief was Gloria M. Roy for respondent Marion County.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

Under Oregon's land use laws, local governments may (and, in some cases, must) engage in periodic review of their comprehensive land use plans. *See* ORS 197.628 to 197.636. As a result of a periodic-review process, the City of Woodburn amended its urban growth boundary (UGB) to include additional land—409 gross acres or about 362 net buildable acres—for industrial use. The city submitted that amendment to the Land Conservation and Development Commission (LCDC) for review. ORS 197.626(1)(b). LCDC approved the city's amendment of its UGB. Petitioners sought judicial review of LCDC's order of approval. We concluded that LCDC's order was inadequate for judicial review and, accordingly, reversed the order and remanded the case to LCDC for reconsideration. *1000 Friends of Oregon v. LCDC*, 237 Or App 213, 239 P3d 272 (2010) (*Woodburn I*). LCDC has now completed that reconsideration and issued a new order approving the city's UGB expansion.

Petitioners again seek judicial review.[1] Petitioners challenge two aspects of LCDC's order: its approval of the amount of industrial land in the UGB amendment and its approval of the inclusion of particular high-value farmland within the UGB as industrial land. Petitioners contend that the city included more industrial land within its UGB than will be developed within the 20-year planning period and that LCDC did not adequately explain why that inclusion is consistent with Statewide Land Use Planning Goals 9 and 14 and other rules. Alternatively, petitioners challenge the city's inclusion within the UGB of high-value farm land, which by law has the lowest priority for urbanization. Petitioners assert that, by approving the inclusion of that land, LCDC made a decision that erroneously interpreted the law and is not supported by substantial evidence. Because we conclude that LCDC again did not adequately explain why the city's expansion of its UGB to include an additional 409 acres for industrial use is consistent with pertinent law, we reverse

---

[1] In the initial judicial review proceeding in this court, the petitioners were 1000 Friends of Oregon, Friends of Marion County, Lolita Carl, Kathleen Carl, Diane Mikkelson, Carla Mikkelson, and Marion County Farm Bureau. In this judicial review proceeding, the petitioners are the same except that Carla Mikkelson does not appear.

the order and remand for reconsideration. Accordingly, we do not reach the second issue—*viz.*, the inclusion of high-value farmland within the city's UGB.

In the late 1990s, the city began the periodic-review process to update its comprehensive plan and other planning documents. As part of that periodic-review process, the city completed various work tasks and, as relevant here, decided in 2005 to expand its UGB to include 409 gross acres for industrial uses. To support the need for that expansion, the city relied on work performed at its direction by consultant ECONorthwest. That work included an economic-opportunities analysis (EOA)—*see* OAR 660-009-0015 (requiring cities with areas within the UGB to perform an economic-opportunities analysis comparing the demand for land for industrial and other employment uses to the existing supply of such land); an economic development strategy—*see* OAR 660-009-0020 (requiring cities with areas within the UGB to adopt policy stating the economic-development objectives for the planning area, based on the economic-opportunities analysis required by OAR 660-009-0015); and a site-requirements analysis.[2]

The city justified the number of acres of industrial land that it added to its UGB using a "target-industries" approach developed through the work of ECONorthwest. Put simply, the target-industries approach considers a local government's employment-growth projections and goals for employment, and establishes a framework for attracting the kind of employers that could reasonably be expected to support the kind and amount of employment growth to which the local government aspires. Given the site needs of those particular employers, the local government identifies potentially available land both within and outside its UGB and selects a group of sites and an amount of land that it believes will accommodate the employers that it seeks to attract. The target-industries approach differs from an "employees-per-acre" approach, under which a local government simply projects employment growth and divides that growth by a

---

[2] The pertinent Oregon Administrative Rules in this case are those that were in effect when the city amended its UGB on November 2, 2005. Accordingly, all references to the OARs in this opinion are to the rules in effect on that date.

statistically accepted number of employees per acre of land in order to arrive at the number of acres needed to support employment growth.

In the target-industries approach developed here, the city aimed to promote economic growth by pursuing development that would create higher-paying jobs to attract new residents who would both live and work in Woodburn. To facilitate that goal, the city identified high-wage target industries that it believed might locate in Woodburn because of its location on I-5 between Portland and Salem. The city then identified the site and building requirements and preferences of the targeted industries. The city also adopted an employment-growth forecast. In light of academic and federal population estimates and forecasts, the city predicted a 20-year employment-growth rate of 3 percent, leading to a projected increase of 8,374 jobs. Ultimately, the city determined that, to further its economic-development strategy and accommodate the volume of job growth that it projected, it needed 42 total industrial sites, 23 of which were available on land within the existing UGB and 19 of which it decided to provide by expanding its UGB into its Southwest Industrial Reserve (SWIR).

In the Woodburn UGB Justification Report, to which LCDC referred in its original order and its order on remand, the city explained the reasons that it needed the additional sites:

"Goal 14, Land Need factor (2), recognizes that changes to a UGB may be based on demonstrated need for employment opportunities.

"* * * * *

"The employment land needs analysis in ECONorthwest's 'Site Requirements for Woodburn Target Industries' (October 2003) concluded that about 370 acres would need to be developed for basic employment uses to accommodate a mid-range need of 7,140 new employees between 2000 and 2020, <u>based on employee-per-acre ratios</u>. However, *to attract targeted industries[,] Woodburn must provide choice among and an adequate inventory of suitable sites. Under the site suitability method, it is possible that some sites may not fully develop during the planning period, either because a portion of the site will be held for future development or*

*because a reserved site will not be selected by a targeted industry.* \*\*\* [T]he proposed Plan includes measures to ensure that \*\*\* such parcels cannot be re-designated for commercial use.

"Woodburn's employment land needs are designed to meet ORS 197.712 and the Goal 9 Rule (OAR Chapter 660, Division 009) requirements that cities 'identify the types of sites that are likely to be needed by industrial and commercial uses which might expand or locate in the planning area.' To be clear, industrial site needs are not based on floor-area ratios or employee per acre ratios."

(First and third emphasis in original; second emphasis added; footnotes omitted.)

Petitioners objected to the UGB amendment, and LCDC considered those objections. Petitioners contended, among other things, that the city had included more industrial land within its amended boundary than was needed to accommodate projected industrial job growth or the needs of its target industries and, accordingly, more industrial land than the city expected to develop over the 20-year planning period, in violation of Goal 9, the land use planning goal that addresses economic development. *Woodburn I*, 237 Or App at 222. Petitioners further argued that the city's target-industries approach "inflate[d]" the number of acres that needed to be included within the UGB to accommodate industrial job growth and did not address the demonstrated need for any additional industrial land to be included in the proposed UGB expansion as required by Goal 14, the land use planning goal that addresses urbanization. *Id.*

LCDC approved the city's expansion of its UGB. LCDC reasoned as follows in rejecting petitioners' objections:

"[The city's UGB Justification Report] identif[ied] the total number of sites required for all the site size needs, and [found] 42 total sites needed for all targeted industries. According to 1000 Friends, this is an oversupply of sites that leads to more land than is justified. *However, the city has designated these sites* to provide for the required short-term supply as well as *to provide market choice among sites. The Commission finds that this is a key component of a successful industrial development strategy, and is required by OAR 660-009-0025.* In addition, the objection states that the city acknowledges that 'not all of the industrial land

proposed for inclusion is expected to develop by 2020.' This is due to the fact that industrial users often choose to purchase a site larger than their immediate need in order to ensure that they have adequate land for future expansion, and the statement referred to by the objector is recognition of that fact. Additionally, OAR 660-009-[0]025(2) specifies that plans must designate serviceable land suitable to meet the site needs identified in Section (1) of this rule. Except as provided for in Section (5) of this rule, the total acreage of land designated must at least equal the total projected land needs for each industrial or other employment use category identified in the plan during the 20-year planning period.

"* * * * *

"In conclusion, the Commission finds that Woodburn's plans for economic development comply with the Goal 9 and Goal 14 rules. The city's employment projection and land needs assessment are reasonable, for the reasons explained in these findings and more particularly described in the Woodburn UGB Justification Report."

*Woodburn I*, 237 Or App at 222-23 (internal quotation marks omitted; some bracketed material added; emphasis in *Woodburn I*). Petitioners sought judicial review of LCDC's approval of the city's UGB amendments. As we characterized petitioners' arguments in our original opinion, they contended that the city had included more land in the UGB than it would need during the 20-year planning period in violation of Goals 9 and 14, and that LCDC's justification for affirming that inclusion—*i.e.*, that the inclusion is required by OAR 660-009-0025 to provide market choice among sites—is not allowed under Goals 9 or 14. *Id.* at 223-24.

We concluded that LCDC's order did not provide an adequate basis for us to review petitioners' contentions. We noted that, "although LCDC discusse[d] Goal 9 and its implementing rules and conclude[d] that the UGB amendment complies with both Goals 9 and 14, LCDC provided essentially no reasoning as to that conclusion with respect to Goal 14. In particular, LCDC offered no explanation concerning the reasons that the need factors of Goal 14 are satisfied under the circumstances of this case." *Id.* at 223.

With respect to Goal 9, we stated that LCDC's "mere reference to 'market choice' [was] insufficient to explain the

reason that the city's UGB expansion is consistent with that goal." *Id.* at 225. We acknowledged that LCDC might have been correct that some forms of "market choice" would be consistent with Goal 9, but rejected the proposition that *all* "forms and degrees" of market choice would be. *Id.* We concluded that, "given the variety of the industries that the city targeted and the diversity and multiplicity of the sites that the city designated, it [was] incumbent on LCDC to cogently explain the reasons that the degree of market choice employed by the city * * * is consistent with the requirements of Goal 9 and OAR 660-009-0025." *Id.* at 226.

With respect to Goal 14, we observed that "a local government is not permitted to establish [a UGB] containing more land than the locality needs for future growth." *Id.* (internal quotation marks omitted). We noted that LCDC had provided only a summary conclusion that the city's UGB amendment was consistent with Goal 14; LCDC had not referred to or explained how the city had satisfied the Goal 14 need factors. *Id.* We concluded that LCDC's treatment was insufficient to explain why including more land than was expected to be developed during the planning period was consistent with Goal 14. *Id.*

In addition, we noted that compliance with Goal 9 does not necessarily establish compliance with Goal 14. *Id.* Accordingly, and because petitioners had asserted that the UGB amendment violated both goals, LCDC had to explain why the amendment was consistent with both the economic development principles of Goal 9 and the urbanization requirements of Goal 14. *Id.*

In conclusion, we stated:

"[B]ecause LCDC did not adequately explain the reasons that the UGB amendment—which included more industrial land than will be developed during the planning period so that the city could provide for market choice among sites— was consistent with Goals 9 and 14, its order failed to respond to petitioners' objections and [was] inadequate for judicial review * * * concerning the propriety of the UGB amendment."

*Id.* at 226-27.

On remand, LCDC circulated a draft revised order to the parties and considered written and oral arguments. On March 16, 2011, LCDC issued a revised order again approving the city's amendment of its UGB. LCDC's analysis rests on two foundations: first, what it characterized as a "close correlation" between the need for industrial land calculated using the employees-per-acre approach and the need for industrial land determined using the target-industries approach, and second, the city's analysis of population, employment, target industries, and site requirements, which LCDC concluded provided a factual and analytical base to establish that the city's decision was consistent with Goal 14, Goal 9, and ORS 197.712 (setting out comprehensive plan requirements). For the reasons explained below, we conclude that LCDC's analysis is not supported by substantial reason.[3]

---

[3] We note that our standard of review of LCDC orders like the one in this case has changed since we decided *Woodburn I*. In 2011, after LCDC issued its revised order in this case and after petitioners had sought judicial review of that order, the legislature amended ORS 197.650 (and other statutes, including ORS 197.633, which includes the standard of review LCDC is to apply to local government actions) at the request of Department of Land Conservation and Development (DLCD) to alter the standards of review that both LCDC and this court will apply in, among other things, periodic-review proceedings. Or Laws 2011, ch 469; *see also* Or Laws 2011, ch 469, § 9 (making amendment effective on passage, June 23, 2011). In so doing, the legislature intended to streamline, in a coordinated way, the process of review—before both LCDC and this court—of local government decisions on UGB amendments. *See* Audio Recording, Senate Committee on Environment & Natural Resources, HB 2031, May 24, 2011, at 52:14 (statement of Bob Rindy, Policy Analyst and Legislative Coordinator, DLCD), https://olis.leg.state.or.us (accessed Dec 19, 2013); Audio Recording, Senate Floor Debate, HB 2031, June 8, 2011, at 56:10 (statement of Senator Dingfelder, carrier of the bill), http://olis.leg.state.or.us (accessed Dec 19, 2013); Staff Measure Summary, Senate Committee on Environment and Natural Resources, HB 2031, June 7, 2011. As pertinent here, under the 2011 amendments, the standard of review described in ORS 197.651(10)—which is substantively akin to our standard of review of Land Use Board of Appeals orders—replaced the standard derived from the Administrative Procedures Act, which we had generally applied when reviewing an LCDC order such as the one in this case. *See* ORS 197.650(1) (2009) (providing, in part, that LCDC orders "may be appealed to the Court of Appeals in the manner provided in ORS 183.482"); *see also Woodburn I*, 237 Or App at 223-27 (applying that standard; reasoning that, to be adequate for judicial review, LCDC's order had to demonstrate substantial reason).

Here, as noted above, before the 2011 amendments became effective, LCDC conducted its post-remand review of the city's actions and issued its revised order—which noted that "[j]udicial review is pursuant to the provision[s] of ORS 183.482 and 197.650"—and petitioners sought judicial review of that order. In light of that unique posture, we conclude that the former standard of review in ORS 197.650(1) (2009) applies. That understanding is consistent with what we

LCDC began its analysis by comparing the projected land need (in buildable acres) based on employment projections and an employee-per-acre calculation—*viz.*, 311 acres—with the projected land need based on the target-industries approach used by the city—*viz.*, 362 acres. LCDC stated that "the relatively close correlation" between those two numbers "provide[d] important corroboration for the city's ultimate decision concerning the amount of land needed for industrial and office uses."[4] Generally, LCDC wrote:

"The more a city's land need for employment based on its analysis of economic opportunities and sites diverges from what would be predicted based solely on forecasted population and employment growth and employee-per-acre ratios, the more thoroughly the city will need to substantiate its economic opportunities analysis and resulting site needs. In effect, the population and employment projections (Goal 14,

understand to be the legislature's intent in adopting Oregon Laws 2011, chapter 469, as a coordinated package of legislation that would streamline review of local government decisions regarding their UGBs. *See also 1000 Friends of Oregon v. LCDC*, 244 Or App 267-68, 259 P3d 1021 (2011) (applying pre-2011 standard of judicial review where the case was pending before the effective date of the 2011 amendments and our decision issued thereafter).

[4] Petitioners contend that, on remand, LCDC impermissibly added the projected land need for "office" employment to the projected land need for "industrial" employment to support its conclusion that the city added a permissible amount of industrial land to its UGB. As we explain below, we conclude that the prong of LCDC's analysis that relies upon that calculation does not meaningfully support its conclusion. Accordingly, we need not address petitioners' argument that LCDC impermissibly added "office" and "industrial" land needs together. We note, however, that LCDC argues on judicial review that the city's "target industries" included both "industrial industries" (*e.g.*, printing and publishing, electronics fabrication) and "non-industrial industries" (*e.g.*, nondepository credit institutions, health services). And the city relied on the projected employment and site needs of all the targeted industries—both "industrial" and "non-industrial"—to justify the expansion of its UGB to include more land for industrial use. It is not readily apparent to us why the targeting of *nonindustrial* employers justifies inclusion within the UGB of any land for *industrial* use. Moreover, the site requirements analysis provided by ECONorthwest provides limited support for the conclusion that the targeted employers require industrial-zoned land. In the site-requirements analysis, ECONorthwest specifically described the site needs for most of the target industries (there is no specific description of the site needs of the industry identified as Industry #36 "Electronics - Fab Plants"—the industry that purportedly needs lot sizes of 100 to 300 acres). As to the four "non-industrial industries," the site requirements analysis indicated that those employers could locate on commercially zoned land. And, even the description of the needs of some of the "industrial industries" (*e.g.*, printing and publishing, wholesale trade) mentions no particular zoning need for the pertinent employer.

factor 1), serve as an elastic constraint on a community's projected land needs based on the aspirations and opportunities (Goal 14, factor 2 and Goal 9), as documented through an EOA and through site requirements. The further the two diverge, the stronger the substantiation required that future opportunities are real (in the sense of land need under Goal 14, factor 1) and not speculative."

Here, according to LCDC, the two numbers (311 and 362) are "relatively close," and so LCDC determined that the population and employment projections "support a conclusion that the city's UGB expansion for industrial and office uses contains an amount of land that is reasonably related to both its forecasted growth (Goal 14, factor 1) and its employment opportunities (Goal 14, factor 2, and Goal 9)."

LCDC did not explain why a close correlation between projected land need based on an employee-per-acre ratio and projected land need based on a target-industries analysis "corroborates" the number projected by the target-industries analysis. Moreover, although LCDC indicated that a local government with a target-industries-based number that is "more" divergent from the employee-per-acre-based number will need to provide "more" thorough substantiation of its EOA and site needs, it gave no content to that analysis: how much more "divergence" requires how much more substantiation? Here, the numbers diverge by more than 16 percent. Would 20 percent no longer be considered "close"? Most importantly, LCDC did not explain why the relationship between the two numbers, in any case, should relieve it from reviewing—or local governments from explaining—why the amount of land proposed to be added to the UGB is consistent with the goals and other law just as carefully as it would if the correlation were not "close." We are not persuaded that the purportedly "close correlation" in this case provides analytical support for LCDC's conclusion that the city added a legally permissible amount of industrial land to its UGB. Accordingly, we turn to the other justifications for approval of the UGB expansion in LCDC's order on remand to determine whether they support the conclusion that LCDC reached.[5]

---

[5] In its brief in this judicial review proceeding, LCDC identifies the "close correlation" approach as LCDC's "analytic framework" for evaluating this case.

In its order on remand, LCDC concluded that the city's analysis of population, employment, target industries, and site requirements provided a factual and analytical base to establish that the city's decision was consistent with Goal 14, Goal 9, and ORS 197.712. LCDC thoroughly reiterated the steps undertaken by the city and its consultant in order to arrive at the conclusion that, under a target-industries analysis and to support the economic opportunities that the city wished to offer, the city needed to add 409 gross acres of land for industrial use. The city indeed engaged in a lengthy process, resulting in a voluminous record, in this periodic-review process. Similarly, LCDC, in its order on remand, recounted in detail the steps that the city took in engaging in and documenting its process. LCDC also walked through applicable goals and other legal provisions, and concluded that the city's expansion of its UGB was consistent with each. What is lacking, however, is a meaningful explanation of *why* the steps taken by the city satisfy those legal standards. Instead, LCDC recounted all the steps that the city took and then concluded—without analysis—that those steps are factually and analytically supported, and are consistent with the law.

LCDC's discussion of Goal 14, factor 2, is illustrative:

"The city's population and employment forecasts provide context for the city's determination of its need for

---

LCDC noted that DLCD Director Richard Whitman acknowledged that there was a "certain element of professional judgment by the experts advising the city as to whether [these] sites are necessary to achieve these employment opportunities" and that such an approach "appear[ed] to give to a consultant" a "degree of discretion" that might lead to "discomfort." Accordingly, Whitman explained, "[t]hat's why we looked at the employee-per-acre approach as a check on that to see if the numbers were in fairly close alignment ***." In its brief, LCDC conceded that, given the "close correlation" between the employee-per-acre number and the target-industries number, "LCDC did not closely scrutinize the substantiation behind the city's stated needs. Instead, it accorded the city a fair amount of deference." Aside from the "close-correlation" comparison, however, LCDC's brief does not identify how it reasoned that the city's land need complied with the law. LCDC's brief does point to LCDC's reliance on the city's "exhaustive and comprehensive assessment of the site needs of its target industries," but we do not understand LCDC to argue that that reliance provides independent reasoning. Although LCDC appears to argue that the only analytical underpinning for the order on remand was the "close correlation" calculation, we nonetheless have reviewed the other justifications in LCDC's order to determine whether they provide substantial reason for its decision.

employment opportunities under Goal 14, factor 2 * * *. The commission finds that there is a reasonable relationship between the city's estimate of 8,374 new jobs during the 2000-2020 planning period and the amount of land it has determined is needed for employment opportunities based on its analysis of economic opportunities, target industries and suitable sites. The commission concludes that for these reasons, and the reasons set forth in the department's response to the written argument of the parties (dated January 7, 2011 and expressly incorporated by this reference) that the amount of land the city has added to its UGB is consistent with both Goal 9 and Goal 14. The city has not added more land than needed during the 20-year planning period. Nor, despite some contradictory statements in the city's planning documents, has it added land in order to provide for 'market choice' (as explained in more detail below). Instead, the amount of land included in the UGB expansion is based on a reasonable projection of what target industries the city is most likely to succeed in attracting or having expand during the planning period, and the site requirements of those industries (the types of sites companies in those industries typically require in order to locate in a community). Finally, * * * the commission also finds that the city's estimate of land need is reasonably related to its projections of population and employment growth during the planning period.

"The commission further finds that the city has demonstrated compliance with Goal 14, factor 2 * * * through its analysis of target industries and suitable sites needed to provide employment opportunities that are reasonably likely to generate the employment needed for the city's current and projected future population. In this instance, the target industries methodology the city used is appropriate and complies with * * * Goal 14, factor 2. Using an employees-per-acre methodology is not required to demonstrate compliance with * * * Goal 14, factor 2, and the city did not use it to demonstrate total land need. The city's decision to use a targeted industries methodology instead of an employees-per-acre [methodology] is permissible under Goal[] * * * 14. As explained above, the city's decision to plan for employment opportunities rather than projected employment based on population growth does not mean that the city added more land than it needs for employment during 2000-2020.

"Goal 9 and Goal 14, factor 2, and the commission's Goal 9 rule (OAR 660-009-0025(2)(2005)) require the city to plan for an amount of land in each site category that at least equals the projected land needs for each category during the 20-year planning period. The city projected land needs by size class—tied to the particular requirements of its target industries, and demonstrated a need for approximately 409 gross acres of land after accounting for sites within the prior UGB. The commission finds that the city's analysis complies with Goals 9 and 14, as well as OAR 660-009 (2000).

"* * * * *

"The city's decision * * * complies with Goal 14, factor[] 2 * * *. Goal 14 requires that '[e]stablishment and change of urban growth boundaries shall be based on the following: (1) Demonstrated need to accommodate long range urban population, consistent with a 20-year population forecast coordinated with affected local governments; and (2) Demonstrated need for housing, employment opportunities, livability or uses such as public facilities, streets and roads, schools, parks or open space, or any combination of the need categories in this subsection (2). In determining need, local government may specify characteristics, such as parcel size, topography or proximity, necessary for land to be suitable for an identified need.'

"* * * * *

"The city complied with Goal 14, factor 2 by identifying its employment opportunities through an economic opportunities analysis, and by establishing the site requirements for target industries needed to accomplish the 20-year economic strategy and associated city policies.

"The commission finds that the city identified a reasonable set of site requirements for its target industries. The portfolio of sites chosen by Woodburn is a reasonable estimation, based on expert opinion, for the city to rely on as to its employment opportunities and corresponding land needs for the planning period.

"The commission finds that the city's use of target industries to identify employment need over the planning period is consistent with the city's population and employment projections. Employment forecasts inform policy decisions and afford local governments the ability to plan a future different from historical trends."

That discussion, while lengthy, does not include reasoning. It includes findings of fact (including facts about what the city or its consultant did during the periodic-review process) and statements of law or policy. It also includes conclusions that the facts in this case satisfy the law. It does not include the reasoning that led LCDC from the facts to its conclusion.

We have extracted each proposition included in LCDC's discussion and categorized it as follows:

- Employment forecasts inform policy decisions and allow local governments the ability to plan a future that differs from historical trends. (statement of policy)

- The city's population and employment forecasts provide context for the city's determination of employment need. (statement of policy)

- The city's estimate of land need is reasonably related to the city's projections of population and employment growth. (conclusion)

- To demonstrate compliance with Goal 14, factor 2, a local government need not use an employees-per-acre methodology, but may use a target-industries methodology. (statement of law)

- The city did not use an employees-per-acre approach; it used a target-industries approach. (finding of fact)

- The city's decision to use a target-industries approach was permissible under Goal 14, factor 2. (conclusion)

- The city's determination of employment need was based on its analysis of economic opportunities, target industries, and suitable sites. (finding of fact)

- The city's analysis of target industries and sites needed to support employment opportunities and future population demonstrate compliance with Goal 14, factor 2. (conclusion)

- The city's decision to plan for employment opportunities (*i.e.*, use the target-industries approach) rather than projected employment based on population (*i.e.*, use the employees-per-acre approach) does not mean that the city added more land than needed during the employment period. (conclusion)

- The amount of land that the city included in the UGB expansion was based on a reasonable projection of the target industries that the city is most likely to attract or have expand during the planning period and the site requirements of those industries. (conclusion)

- The city identified a reasonable set of site requirements for its target industries. (conclusion)

- The "portfolio" of sites that the city chose was based on expert opinion and is a reasonable estimate of what the city will need to provide the land needed to support the employment opportunities that it has chosen. (finding of fact; conclusion)

- The city has demonstrated compliance with Goal 14, factor 2, through its target-industries and site-needs analysis. (conclusion)

- A local government must plan for an amount of land that will meet at least the projected land need for each category during the planning period. (statement of law)

- The city projected land needs by class size tied to the needs of its target industries. (statement of fact)

- The city took into account sites within the existing UGB. (statement of fact)

- The city demonstrated a need for 409 gross acres of land. (conclusion)

- The city's analysis complies with Goals 9 and 14 and OAR 660-009. (conclusion)

- The city complied with Goal 14, factor 2, by identifying its employment opportunities through its EOA and by establishing the site requirements that its target industries would need to accomplish the city's economic strategy. (conclusion)

- The city did not add more land to the UGB than it will need during the 20-year planning period. (conclusion)

- The city did not add land to the UGB in order to provide market choice. (conclusion)

To the extent that LCDC intended to base its conclusion that the city's actions complied with Goal 14, factor 2, on the proposition that the city had engaged in a particular

process, that is insufficient. If it were sufficient, local governments could establish compliance with Goal 14, factor 2, simply by verifying that they had engaged in the correct process, regardless of their conclusions. Substantial reason requires, at the least, an explanation of why the process in which a local government engaged *and* the results that it reached are consistent with the law.

In addition, LCDC incorporated into its discussion of Goal 14, factor 2, "the reasons set forth in the department's response to the written argument of the parties." We have examined that response and conclude that it fails to supply LCDC's order with substantial reason. The response relies on the same two foundations described above: (1) the "close correlation" between the amount of land actually added to the UGB and the amount that would have been added using an employees-per-acre approach ("[E]ven under the employee per acre method of estimating future land need, the approximately 360 net acres of land that the city has added to its UGB for industrial and office uses * * * is reasonably related to the amount of land shown to be needed under a traditional employee per acre methodology.") and (2) the city engaged in "steps [that] are a permissible means of complying with Goals 9 and 14[.]" As we have explained, those foundations do not provide substantial reason.

We have carefully reviewed LCDC's entire order on remand, and we conclude that LCDC did not adequately explain the reasons that led it to conclude the city's UGB amendment complied with applicable law. As noted, in light of that disposition, we do not address petitioners' arguments regarding the inclusion of certain high-value farmland within the UGB as industrial land.

Reversed and remanded for reconsideration.